## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ | ) |
| **John Doe**, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )  **CIVIL ACTION NO:** |
| **Western New England University,** | ) |
| **Anthony S. Caprio, Joanne Ollson,** | ) |
| **Beth A. Hill, Donna-Rae Kenneally,** | ) |
| **and Kymberly Hendricks,** | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

### VERIFIED COMPLAINT AND JURY DEMAND

#### <u>Overview of the Case</u>

1.  This is a verified complaint for monetary damages and injunctive relief filed by the plaintiff, John Doe, a student at Western New England University ("WNEU" or the "University") against the Defendant University, its President, and certain administrators for wrongfully and illegally violating their obligations to him under federal law, state law, and Defendant WNEU's own policies and procedures.

2.  This case arises out of the actions of all of the Defendants in response to a false allegation of sexual misconduct made against John Doe by Linda Loe (a pseudonym), who is a fellow student at Defendant WNEU.

3.  The events in this case began on the evening of September 26-27, 2014, when John Doe and Linda Loe were sexually intimate in a dormitory room at Defendant WNEU.

4.  Following her sexual intimacy with John Doe, Linda Loe immediately texted at least three of her friends.

5.  Throughout Linda Loe's text messages with her friends, she inserted multiple "emojis" as she described her sexual intimacy with John Doe, including smiling faces with <u>huge</u> smiles, "thumbs-up" signs, and hands making the "A-OK" sign.

6.  Yet despite these immediate positive text messages to multiple friends about her sexual intimacy with John Doe, nine months later, on June 16, 2015, Linda Loe reported to the Defendants that she had in fact not consented to her sexual intimacy with John Doe.

7.  In response to Linda Loe's false allegation, the Defendants undertook a botched investigation in the course of which they violated:  Title IX of the Education Amendments of 1972 ("Title IX"); the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (the "Clery Act") and the Clery Act's implementing regulations, 34 Code of Federal Regulations Part 668, Section 668.46 (the "Clery Act Regulations"); Section 444 of the General Education Provisions Act (20 U.S.C. 1232g), commonly referred to as the Family Educational Rights and Privacy Act ("FERPA"); and Defendant WNEU's own policies and procedures, as set forth in various University documents that formed a contract between the Defendant WNEU and John Doe.

8.  For example, the Defendants demonstrated their illegal bias against John Doe as a male by failing to challenge Linda Loe in the face of the multiple contradictions, inconsistencies, and impossibilities regarding her statements about her sexual intimacy with John Doe.

9.  Moreover, also in violation of the laws, regulations, and policies set forth above, the Defendants attempted to bully John Doe into giving up the rights he enjoys under those federal laws and regulations, state law, and Defendant WNEU's own policies and procedures.

10. Additionally, in violation of Title IX, the Clery Act, the Clery Act Regulations, FERPA, and Defendant WNEU's own policies and procedures, the Defendants engaged and are continuing to engage in illegal and biased procedural actions against John Doe.  The Defendants' illegal conduct includes ordering John Doe to appear on Tuesday, November 3, at a flawed, biased, and illegal hearing, at which the Defendants seek Mr. Doe's suspension or dismissal from the Defendant University.

11. In contravention of the due process granted to Mr. Doe by Title IX, the Clery Act, the Clery Act Regulations, state law, and <u>Defendant WNEU's own policies and procedures</u>, **one of the two Hearing Officers who will decide Mr. Doe's fate at the Nov. 3, 2015 hearing is the <u>direct subordinate</u> of <u>two</u> of the individual Defendants <u>who have *already* determined, using the *same* standard of proof that the subordinate will use as a Hearing Officer, that Mr. Doe should be suspended or dismissed from the Defendant University</u>.**

12. It is for all of these reasons, discussed in detail below, as well as additional reasons also discussed in detail below, that John Doe, in addition to the other relief requested, asks that this Court issue a Preliminary Injunction, and at the close of this case, a Permanent Injunction, preventing the Defendants from illegally depriving him of his rights to due process in this matter.  All of those due process rights are <u>guaranteed</u> to him by federal law and regulation, state law, and the Defendant University's own policies and procedures.

## JURISDICTION AND VENUE

13. The Defendants have breached their contractual and other obligations to John Doe, and in the course of doing so have violated Title IX, the Clery Act, the Clery Act Regulations, and FERPA.

14. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332.

3

15. The plaintiff is a resident of Maine, and, upon information and belief, the defendants are residents of Massachusetts.  The amount in controversy is over $75,000.

16. Venue is proper under 28 U.S.C. § 1391(b).

## PARTIES

17. The Plaintiff John Doe ("John Doe" or the "Plaintiff") resides in Maine and is a full-time student at WNEU.

18. During the events described herein, the Plaintiff was a student at WNEU and resided on the WNEU campus in Springfield, Massachusetts.

19. Defendant WNEU is a federally funded, private, non-profit university located in Springfield, Massachusetts.

20. Defendant Anthony S. Caprio is the President of Defendant WNEU.  Defendant Caprio is sued in his individual and official capacity.

21. Defendant Joanne Ollson is the Assistant Vice President and Director of Human Resources at Defendant WNEU.  She also holds the position of Defendant WNEU's "Title IX Coordinator."  Defendant Ollson is sued in her individual and official capacity.

22. Defendant Beth A. Hill is the Senior Associate Director of Residence Life at Defendant WNEU.  Defendant Hill is sued in her individual and official capacity.

23. Defendant Donna-Rae Kenneally is the Manager of Benefits Administration at Defendant WNEU.  Defendant Kenneally is sued in her individual and official capacity.

24. Defendant Kymberly Hendricks is the Assistant Director of Residence Life for Programming & Graduate Housing at Defendant WNEU.  Defendant Hendricks is sued in her individual and official capacity.

4

**Linda Loe's and John Doe's Sexual Intimacy on the Evening of Sep. 26-27, 2014**

25. On the evening of September 26-27, 2014, Linda Loe and John Doe attended a party in a dormitory room at Defendant WNEU.  After spending some time at the party, John Doe and Linda Loe left the party, planning to go to her dormitory room to watch a movie on Linda Loe's laptop computer.  Linda Loe's roommate was present, and John Doe and Linda Loe asked Linda Loe's roommate if they could watch the movie with Linda Loe's roommate present.  Linda Loe's roommate said that she wanted to go to sleep and not be disturbed by the sound from the laptop, so Linda Loe and John Doe went to John Doe's dormitory room to watch the movie.  Upon arriving at John Doe's dormitory room, John Doe and Linda Loe began watching the movie "The Fault in Our Stars."  At some point thereafter, John Doe and Linda Loe began kissing.  After a period of time, Linda Loe and John Doe removed their clothes and became sexually intimate, including engaging in consensual mutual and simultaneous oral sex.

26. During the sexual intimacy between Linda Loe and John Doe, according to Linda Loe's own multiple statements, **each and every time** Linda Loe said "no" to a suggested sexual activity or wanted to stop an ongoing sexual activity, John Doe honored her response and either did not attempt to engage in the proposed sexual activity or immediately stopped the ongoing sexual activity.  For example, after Linda Loe said "no" to John Doe's request for penile-vaginal intercourse, Linda Loe and John Doe continued to engage in other intimate sexual acts, including consensual mutual and simultaneous oral sex.

27. While Linda Loe and John Doe were together in John Doe's room, at least two people came into the room:  John Doe's male roommate, and a female student who lived in the same dormitory.  Neither person who came into the room saw anything amiss.

5

28. When the sexual intimacy between Linda Loe and John Doe concluded at some point on the evening of Sep. 26-27, 2014, Linda Loe got dressed, left John Doe's dormitory room, and went back to her own dormitory room.

29. Sometime after leaving the dormitory room, Linda Loe began to send text messages to at least three friends regarding her sexual intimacy with John Doe.

30. Counsel for John Doe cannot attach the text message strings as exhibits to the Verified Complaint, because as will be detailed in later paragraphs, <u>in violation of the Clery Act Regulations, FERPA, and Defendant WNEU's own policies and procedures</u>, the Defendants have refused to provide John Doe and his counsel with copies of <u>any</u> of the records relevant to the investigation, and have instead required John Doe's counsel to copy hundreds of documents <u>by hand</u>.

31. Portions of Linda Loe's text message exchanges are set out below.  Text messages sent by Linda Loe appear in **bold** font.  Her interlocutors' text messages are set out in regular font.

32. Linda Loe had a text message exchange with Amy Ames (a pseudonym) on September 27, 2014, beginning shortly after her sexual intimacy with John Doe had concluded.  That text message string included the following messages:

- **Linda Loe** ("**LL**") 1:59 a.m.:  **"I may or may not have had my first kiss and hook up."  (Linda Loe concluded the message with an "emoji" showing a face with a <u>huge</u> smile.)**

- Amy Ames ("AA") 6:01 a.m.:  "Uh, I need more details than that."

- **LL** 7:29 a.m.:  **"The guy <u>in all my snapchats last night</u>…  We were watching fault in our stars and we were also playing 20 questions and he asked me when my first kiss was and I told him never and he was shocked and he's just like let's**

6

**change that so he kissed me and then we started making out and then stuff**

**happened….”** (underlining supplied)

- AA  7:44 a.m.:  “Like what kind of stuff linda loe”

- AA  7:44 a.m.:  “LINDA”

- **LL** 7:45 a.m.:  **“Um everything but sex.”  (As with her first text message, Linda**

  **Loe concluded this text message with an “emoji” showing a face with a <u>huge</u>**

  **smile.)**

- **LL**  7:45 a.m.:  **“Yeah I know…  I wasn’t expecting that at all <u>haha</u>”** (underlining

  supplied)

- **LL**  7:46 a.m.:  **“<u>He wasn’t even good</u>”**  (underlining supplied)

- AA  7:46 a.m.:  “Haha”

- **LL**  7:48 a.m.:  **“Yeahhh”**

- AA  7:48 a.m.:  “You blew him?!?!”

- AA  7:48 a.m.:  “OMG”

- AA  7:48 a.m.:  “wait you didn’t swallow right?”

- **LL** 7:48 a.m.:  **“Yeah” (Yet again, for the third time, Linda Loe concluded this**

  **text message with an “emoji” showing a face with a HUGE smile.)**

- **LL** 7:49 a.m.:  **“No…  And I only did it for a little bit…  Not long enough for him**
  **to do that.”**

  ***

- **LL** 7:55 a.m.:  **“Yeahhh and someone walked in on us so now everyone in the hall**

  **pretty much knows <u>we hooked up</u>.”  (Linda Loe concluded this text message**

  **with an “emoji” showing a hand with the index finger touching the thumb in a**

  **circular fashion, thus making the “A-OK” sign.)**  (underlining supplied)

- **AA** 7:55 a.m.: "Hahaha that's the best"
- **LL** 7:56 a.m.: **"Literally someone was knocking and <u>we</u> threw the covers over us and then they didn't come in and then all of a sudden some girl walks in…."** (underlining supplied)
- AA 7:56 a.m.: "Wtf"
- AA 7:56 a.m.: "Gotta learn to lock your door ;)"
- **LL** 7:57 a.m.: **"The door was locked (Linda Loe inserts an "emoji" showing a frowning face) she used the roommates key and then asked if the roommate could come in <u>haha</u>"** (underlining supplied)
- **LL** 7:57 a.m.: **"The door was locked"**
- AA 7:58 a.m.: "I would of three [threw?] something at her"
- **LL** 7:58 a.m.: **"I just didn't look her in the eyes"  (As with her earlier text message, Linda Loe concluded this text message with <u>two</u> "emojis" showing faces with <u>huge</u> smiles.)**
- **LL** 7:58 a.m.: **"Like supa awkward"**

33. Amy Ames is not a student at Defendant WNEU, and because the Defendants have refused to allow John Doe to have copies of <u>any</u> of the records related to the investigation, John Doe and his counsel have been unable to locate Amy Ames.

34. Linda Loe also had a text message exchange with Brenda Boe (a pseudonym) on September 27, 2014.  That text message string included the following messages, the first of which appears to be identical to, and sent at the same time as, the text message she sent to Abigail Ames:

- **LL** 1:59 a.m.: **"I may or may not have had my first kiss and hook up."  (Linda Loe concluded the message with an "emoji" showing a face with a <u>huge</u> smile.)**

- BB  6:14 a.m.: "Omg with who what happened"

- BB 7:30 a.m.: "What happened what happened"

- **LL** 7:30 a.m.: **"Ummm pretty much everything but sex" (Again, Linda Loe concluded the message with an "emoji" showing a face with a <u>huge</u> smile.)**

35. Brenda Boe, like Amy Ames, is not a student at Defendant WNEU, and because the Defendants have refused to allow John Doe to have copies of <u>any</u> of the records related to the investigation, John Doe and his counsel have been unable to locate Brenda Boe.

36. Linda Loe also texted Carrie Coe (a pseudonym), Linda Loe's current roommate.  Although the Defendants have digitally gathered the contents of Linda Loe's text messages to Carrie Coe and preserved them on a computer thumb drive, the Defendants have refused, and are continuing to refuse, to provide John Doe and his counsel with a digital copy of the thumb drive, which would contain the contents of those text messages.  Instead, the General Counsel for the Defendant University informed counsel for John Doe that Mr. Doe's counsel would only be able to review the <u>thousands</u> of text messages on a computer screen in Defendant Hendricks's office, with Defendant Hendricks and the General Counsel for the Defendant University present, within the limited time allowed for counsel to review the contents of the Partial Binder.

37. Because the only opportunity John Doe and his counsel were offered to review the thousands of text messages sent and received by Linda Loe was during the few hours that counsel for John Doe were given to copy the hundreds of paper documents provided to them <u>by hand</u>, <u>counsel for John Doe have been unable to review **any** of the contents of the thumb drive</u>.

38. Moreover, the General Counsel for the Defendant University admitted to counsel for John Doe that indeed <u>thousands</u> of text messages written by and to Linda Loe exist on the thumb drive but that the Defendants had determined, <u>in their sole discretion</u>, which text messages were relevant to Linda Loe's allegation.

39. Additionally, the General Counsel for the Defendant University admitted to counsel for John Doe that the Defendants had determined, in their sole discretion, which text messages would be disclosed in paper form to John Doe and his counsel, for possible copying by hand, and which text messages would remain on the thumb drive, <u>effectively concealed from review</u>.

## <u>LINDA LOE'S FALSE ALLEGATION, NINE MONTHS AFTER HER CONSENSUAL SEXUAL INTIMACY WITH JOHN DOE</u>

40. According to multiple witnesses interviewed by the Defendants, following Linda Loe's and John Doe's sexual intimacy on the evening of September 26-27, 2014, Linda Loe and John Doe interacted normally and routinely for the rest of the 2014-1015 academic year.  This routine interaction included Linda Loe's attendance at two parties John Doe held in his dormitory room, one later in the Fall semester and one in the Spring semester.  Additionally, both Linda Loe and John Doe attended a Halloween party in October 2014.  A photo taken at that party shows Linda Loe and John Doe together, smiling.  Again, counsel for John Doe cannot attach a copy of this photo as an exhibit to the Verified Complaint, because the Defendants have refused to provide John Doe and his counsel with a copy of the photo.

41.  Following the end of the 2014-2015 academic year at Defendant WNEU, the next significant event in this matter occurred nine months later, on June 15, 2015, when Linda Loe made her false allegation.

## TITLE IX

42. Title IX of the Education Amendments of 1972 ("Title IX"), 86 Stat. 373, 20 U.S.C.

     § 1681(a) (2012) is a federal civil rights law that prohibits discrimination on the basis of sex

     in federally funded education programs and activities.

43. All public and private colleges and universities that receive any federal financial assistance

     must comply with Title IX.

44. Defendant WNEU receives federal financial assistance.

45. Defendant WNEU must comply with Title IX.

46. Under Title IX, Defendant WNEU must ensure that WNEU students are not denied or

     limited in their ability to participate in or benefit from Defendant WNEU's educational

     programs or activities on the basis of their gender.

47. The U.S. Department of Education's Office of Civil Rights ("OCR") enforces several Federal

     civil rights laws, including Title IX.

48. OCR has, over the years, published multiple documents providing OCR's guidance on

     OCR's interpretation of the statutory language of Title IX.

49. OCR published its most recent comprehensive guidance on April 29, 2014, in a document

     entitled "Questions and Answers on Title IX and Sexual Violence" ("OCR's 2014

     Guidance").

50. OCR's 2014 Guidance states, on page 13:  "The rights established under Title IX must be

     interpreted consistently with any federally guaranteed due process rights."

51. OCR's 2014 Guidance, in footnote 28 on page 25, emphasizes the following with respect to

     its guidance regarding Title IX investigations:  "It [the guidance] does not address legal

requirements under the U.S. Constitution, the Clery Act, or other federal, state, or local laws."  (emphasis supplied)

52. The federal Clery Act regulations, discussed below, provide federally guaranteed due process rights to students, such as John Doe, who are the subject of university disciplinary proceedings brought pursuant to Title IX.

53. Additionally, OCR's 2014 Guidance, on page 26, also requires that when colleges and universities conduct Title IX investigations, they comply with the following specific provisions:

- Throughout the investigation, the parties must have an equal opportunity to present relevant witnesses and other evidence. (emphasis supplied)

- If the school permits one party to submit third-party expert testimony, it must do so equally for both parties.

54. The Defendants have failed to comply with OCR's guidance requiring that the parties "must" have an "equal opportunity to present relevant witnesses and other evidence" because they have repeatedly refused to provide John Doe and his counsel with copies of any of the investigation materials that the Defendants possess, and instead have required them to copy hundreds of pages by hand.

55.  Additionally, the Defendants have failed to comply with OCR's guidance requiring that the parties "must" have an "equal opportunity to present relevant witnesses and other evidence" because they have repeatedly refused to provide John Doe and his counsel with a copy of the thumb drive containing the contents of Linda Loe's cell phone, which includes thousands of text messages, hundreds of audio messages, and hundreds of photographs.

56. In addition, the Defendants have consulted, as an <u>expert</u>, with a Nurse Practitioner who is an employee of the Defendant University.  Counsel for Mr. Doe believe that this Nurse Practitioner has information, and has made a determination, that is <u>exculpatory</u> for John Doe.  <u>Yet the Defendants have refused to allow counsel for John Doe to interview the Nurse Practitioner, or to have access to whatever it is she may have examined or been told.</u>

57. Moreover, the Defendants have also <u>refused</u> to allow John Doe or his counsel interview <u>any</u> of the witnesses prior to the hearing on November 3, 2015, <u>including *any* of the students and employees involved, *all* of whom the Defendants have *already* interviewed *at length*</u>.

58. OCR's 2014 Guidance, on page 25, requires the following:  "In all cases, a school's Title IX investigation must be <u>adequate</u>, <u>reliable</u>, <u>impartial</u>, and <u>prompt</u> and <u>include the opportunity for both parties to present witnesses and other evidence</u>."

59. As the facts set forth in this Verified Complaint have and will demonstrate, the Defendants' investigation of this matter was not adequate, is not reliable, is not impartial, was not prompt, and, because the Defendants have denied John Doe and his counsel the opportunity to interview <u>any</u> of the witnesses, has not and will not include the opportunity for John Doe to present witnesses and other evidence at the November 3, 2015 hearing as is required by the due process rights granted by Title IX, The Clery Act Regulations, FERPA, and Defendant WNEU's own policies and procedures.

## THE CLERY ACT AND THE CLERY ACT REGULATIONS

60. On March 7, 2013, President Obama signed the Violence Against Women Reauthorization Act of 2013 (VAWA) (Pub. L. 113–4), which, among other provisions, amended section 485(f) of the Higher Education Act of 1965, as amended, otherwise known as the Jeanne

Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (the "Clery Act").

61. Institutions of higher education that participate in the federal financial aid programs are subject to the requirements of the Clery Act as well as Title IX.  (*See* OCR's 2014 Guidance, p. 44).

62. Defendant WNEU is an institution of higher education that participates in federal financial aid programs.

63. Defendant WNEU is subject to the requirements of the Clery Act.

64. On Oct. 20, 2014, the U.S. Department of Education amended the implementing regulations for the Clery Act.  The Clery Act regulations are found at 34 Code of Federal Regulations Part 668, Section 668.46 (the "Clery Act Regulations").

65. The amended regulations require educational institutions, including Defendant WNEU, to adhere to certain policies, procedures, and programs with respect to allegations of campus sexual assault.

66. The Clery Act Regulations require that in cases of allegations of campus sexual assault, Defendant WNEU's investigation and disciplinary proceedings must:

- "Include a prompt, fair, and impartial process from the initial investigation to the final result."  34 Code of Federal Regulations Part 668, Section 668.46(k)(2)(i).

- "Be conducted by officials who, at a minimum, receive annual training on issues related to dating violence, domestic violence, sexual assault, and stalking and on how to conduct an investigation and hearing process that protects the safety of victims and promotes accountability."  34 Code of Federal Regulations Part 668, Section 668.46(k)(2)(ii).

67. Under the Clery Act Regulations:

- "*Advisor* means any individual who provides the accuser or accused support, guidance, or advice."  34 Code of Federal Regulations Part 668, Section 668.46(k)(3)(ii).

- "*Proceeding* means all activities related to a non-criminal resolution of an institutional disciplinary complaint, including, but not limited to, factfinding investigations, formal or informal meetings, and hearings." 34 Code of Federal Regulations Part 668, Section 668.46(k)(3)(iii).

68. Under the Clery Act Regulations, a "prompt, fair, and impartial proceeding includes a proceeding that is:"

- "Conducted by officials who do not have a conflict of interest or bias for or against the accuser or the accused." 34 Code of Federal Regulations Part 668, Section 668.46(k)(3)(i)(C).

- "Conducted in a manner that –"

   o "Is consistent with the institution's policies and transparent to the accuser and accused" 34 Code of Federal Regulations Part 668, Section 668.46(k)(3)(i)(B)(*1*).

   o "Provides **timely** and **equal access to** the accuser, ***the accused***, **and appropriate officials** to ***any* information** that will be used during informal and formal disciplinary meetings and hearings" 34 Code of Federal Regulations Part 668, Section 668.46(k)(3)(i)(B)(*3*).  (emphasis supplied)

69. Thus, **throughout this investigation**, under the Clery Act Regulations, the Defendants have been, are, and continue to be **required** to provide John Doe with **equal** access to ***all* the**

**information** _the Defendants themselves have been using, are using, and will be using_ regarding their investigation of John Doe.

70. Yet despite the <u>multiple</u> requests from counsel for Mr. Doe that the Defendants comply with these <u>mandatory</u> federal regulatory requirements, the Defendants have refused to do so, <u>repeatedly</u> and illegally.

### FERPA

71. Section 444 of the General Education Provisions Act (20 U.S.C. 1232g) is commonly referred to as the Family Educational Rights and Privacy Act ("FERPA").

72. On July 6, 2015, counsel for John Doe informed the General Counsel for the Defendant University that Mr. Doe was demanding access to, and copies of, all of the Defendant University's records relating to this investigation.  _See_ July 6, 2015 letter from Attorney Stephen E. Spelman, attached hereto as Exhibit A.  (In all the attached exhibits, the actual names of John Doe, Linda Loe, and all student witnesses have been redacted).

73. Under FERPA, John Doe was and is entitled to copies of all of the items demanded in Attorney Spelman's July 6, 2015 letter to Defendant University's General Counsel, pursuant to 20 U.S.C. § 1232g(a)(4)(A); 34 C.F.R. subpart D; 34 C.F.R. § 99.3, 34 C.F.R. § 99.8(b)(2)(i) and (ii); 34 C.F.R. §§ 668.46(f) and (k)(3)(i)(B)(_3_), and 45 C.F.R. §164.501, as the demanded records are education records maintained by Defendant WNEU that contain information directly related to John Doe.

74. Under FERPA, <u>as well as under Defendant WNEU's own policies</u>, the Defendants were required to provide John Doe with copies of all the requested records <u>within 45 days</u> (August 20, 2015).  As of the date of this Complaint, despite multiple written and in-person requests, the Defendants have still illegally refused to provide the records, in violation of federal law.

**DEFENDANT WNEU'S POLICIES AND PROCEDURES**

**Defendant WNEU's 2014-2015 Student Handbook
and 2015-2016 Student Handbook**

75. The "Western New England University 2015-2016 Student Handbook" (the "*2015-2016 Student Handbook*") is the student handbook in use for the Fall Semester 2015.  A copy of the *2015-2016 Student Handbook* is attached hereto as Exhibit B.

76. The "Western New England University 2014-2015 Student Handbook" (the "*2014-2015 Student Handbook*") was the student handbook in use for the Academic Year 2014- 2015.

77. Each Student Handbook formed, and is evidence of the terms and conditions of, a contract between WNEU and its students, including John Doe.

78. The terms and conditions of the Defendant University's contracts with John Doe include the statements and promises made by Defendant WNEU in the *2014-2105 Student Handbook* and the *2015-2016 Student Handbook*.

79. The statements and promises made by Defendant WNEU in the *2014-2015 Student Handbook* and the *2015-2016 Student Handbook* were and are definite and certain, and induced John Doe's reliance on the statements and promises in the two student handbooks.

80. John Doe attended Defendant WNEU in the academic year 2014-2015, and paid all required tuition and fees.

81. John Doe is attending Defendant WNEU in the fall semester of academic year 2015-2016, and has paid all required tuition and fees.

82. In attending Defendant WNEU, and in paying the required tuition and fees, John Doe relied on the terms and conditions of the contract between himself and Defendant WNEU established in each Student Handbook.

83. Defendant WNEU itself imposed the terms and conditions in each Student Handbook.

84. Defendant WNEU's web site, accessed on November 1, 2015, in referring to the Student

Handbook, states at http://www1.wne.edu/studentactivities/index.cfm?selection=doc.10672

that: "All students are expected to abide by the guidelines and will be held accountable for

the information contained in the Handbook."

85. Both Student Handbooks formed, and are evidence of the terms and conditions of, a contract

between Defendant WNEU and John Doe for the relevant academic year.

## The *2015-2016 Student Handbook* and FERPA

86. The Student Records and Confidentiality section of the *2015-2016 Student Handbook*, at

page 157, states that "Western New England University adheres to a policy of compliance

with the Family Educational Rights Privacy Act (FERPA)."

87. The *2015-2016 Student Handbook* states on page 157 that in complying with FERPA,

Defendant WNEU "permits students to inspect their educational records."

88. The *2015-2016 Student Handbook* states on page 157 that:  "Educational records include

those records that contain information directly related to a student and are maintained as

official files by the University."

89. With respect to educational records, the *2015-2016 Student Handbook* states on page 157:

"Record means any information or data recorded in any medium, including but not limited to

handwritten or printed materials, tapes, computerized information, or film."

90. The *2015-2016 Student Handbook* states on page 157:  "Student Right of Access – Students

may inspect and review their educational records in accordance with the procedures outlined

here."

91. Section V of the Student Records and Confidentiality section of the *2015-2016 Student*

*Handbook* is entitled "Procedure for Access to Records."  In relevant part, this section states,

on page 158:  "Requests for access specifying the records to be inspected should be made in writing to the office maintaining the file.  The University will comply with the request within a reasonable time, at most 45 days.  In the usual case, arrangements will be made for the student to read her/his records in the presence of a staff member."

92. Section VI of the Student Records and Confidentiality section of the *2015-2016 Student Handbook* is entitled "Request for Copies of Records."  In relevant part, this section states on page 158:  "**A student may also obtain copies of her/his records** by paying reproduction costs of $.25 per page.  Requests for copies should be made in writing to the office maintaining the file.  **The University will comply with the request within a reasonable time, at most within 45 days**." (emphasis supplied)

93. In addition, the *2015-2016 Student Handbook* includes what is entitled a "Sexual Harassment/Sexual Misconduct and Title IX Policy."  Under the "Resolution of Claims" section of the policy, the *2015-2016 Student Handbook* states on page 182 that a respondent such as John Doe is "entitled to:  A pre-hearing informational meeting with the administrative officer [in this case Defendant Hendricks], during which "the report(s), audio and video documentation, about the alleged misconduct will be read and explained." (emphasis supplied)

94. It is thus clear that by refusing to provide John Doe with copies of all the records, including documents, audio files, visual files, and other digital files in their possession relating to their investigation of Linda Loe's allegation, the Defendants violated not only Title IX, the Clery Act, the Clery Act Regulations, and FERPA, but also their own policies and procedures as guaranteed in the *2015-2016 Student Handbook*.

**The *2014-2015 Student Handbook* and**
**the Proceeding by Defendant WNEU Against John Doe**

95. On October 13, 2015 the General Counsel for Defendant WNEU informed John Doe and his counsel by email that with respect to the disciplinary hearing brought by the Defendants against John Doe, seeking John Doe's dismissal or suspension from Defendant WNEU, the Defendants intend to apply the policies, procedures, and practices set out in the 2014-2015 Student Handbook.  The email also attached a copy of the *2014-2015 Student Handbook*. That email and the *2014-2015 Student Handbook* are attached hereto as Exhibit B.

96. On October 14, 2015, the Defendant University's General Counsel informed John Doe and Mr. Doe's counsel that the Defendants would be proceeding against Mr. Doe under the *2014-2015 Student Code of Conduct* contained in the *2014-2015 Student Handbook* because that was the document in effect when the incident occurred.

97. The *2014-2015 Student Handbook*, at page 147, states that the "policies and procedures" in the Student Handbook "are not simply a list of essential expectations for personal behavior or use of physical space; they <u>exist to inform students of </u> both <u>their rights</u> and their responsibilities as students."  (emphasis added)

98. The *2014-2015 Student Handbook* contains a section entitled "Sexual Harassment and Sexual Misconduct Policy."  The subsection of the Sexual Harassment and Sexual Misconduct Policy entitled "Resolution of Claims" states on page 182:  "Procedures for addressing allegations of student-to-student sexual misconduct or harassment or when the student is the respondent will be addressed though the Student Code of Conduct, Section Two, Article III, Section A:  Offenses Against Another Person(s)."

**The 2014-2015 Student Code of Conduct**

99. Defendant WNEU's "Student Code of Conduct And Other Policies" (the "*2014-2015 Student Code of Conduct*") begins on page 161 of the *2014-2015 Student Handbook*.

100.    Article II of Section Two of the *2014-2015 Student Code of Conduct* is entitled "Statement of General Expectations of Students" and states in part on page 164 that: "Western New England University recognizes that our community is not limited to our physical campus and includes 'online' and 'offline' interactions and postings."

101.    Article II of Section Two of the *2014-2015 Student Code of Conduct* also states in part on page 164 that: "Students are expected to be honest and forthright in their dealings with University officials, faculty, staff, offices, committees, and each other.  Violations of this provision will be considered sanctionable offenses."

102.    Article III of Section Two of the *2014-2015 Student Code of Conduct* is entitled "Specific Standards of Behavior" and states in part on page 165:  "Certain behaviors by any student … can violate the Student Code of Conduct.  Prohibited behaviors include, but are not limited to:

    A.  Offenses Against Another Person(s), such as:
       …
- Any actual or threatened non-consensual sexual act or misconduct.  Non-consensual presumes that the other person is able to make a reasonable judgment under the circumstances and is not impaired by intoxication, unconsciousness, or other incapacity.  If the other person is impaired, a student may not guess, assume, or infer consent."

103.    Critically, pursuant to the "Resolution of Claims" section of the 2014-2015 Sexual Harassment and Sexual Misconduct Policy, Subsection A of Article III regarding an "actual

or threatened non-consensual sexual act or misconduct" is the <u>only</u> section of the *2014-2015 Student Handbook* that is relevant to the allegation made by Linda Loe.  The problems with this subsection are many.

104.    To begin with, the subsection plainly states that an "<u>act</u>" is <u>non</u>-consensual if "the other person" (whoever that may be) "<u>is</u> able to make a reasonable judgment under the circumstances and is not impaired by intoxication, unconsciousness, or other incapacity."

105.    Even if the language of the subsection is read literally and narrowly (as a college disciplinary rule should be, so that students are put on notice of exactly what activities are proscribed), then <u>all</u> sexual acts would seem to be deemed non-consensual.  This directly and clearly violates Title IX's requirement that any investigation based on such a policy be adequate and reliable.

106.    Second, there is <u>no</u> allegation in this case that Linda Loe was in <u>any</u> way "impaired by intoxication, unconsciousness, or other incapacity."

107.    In fact, Linda Loe told the investigators from the Defendant University that she was <u>not</u> impaired by intoxication, and they made a specific finding that she was not so impaired. (Both Linda Loe's statement regarding her lack of intoxication and the specifics regarding Defendants' investigative report and conclusions are discussed below).

108.    Thus, the "impairment" aspect of the subsection is absolutely irrelevant to Linda Loe's allegation against John Doe.

109.    This means that under the *2014-2015 Student Code of Conduct* the <u>only</u> relevant issue is whether Linda Loe was "able to make a reasonable judgment under the circumstances."

110.    Yet as will be seen, the Defendants instead have illegally and discriminatorily imposed an
underlined requirement, from a policy that was not even *created* until *after* the sexual
intimacy between Linda Loe and John Doe on the evening of September 26-27, 2014.

111.    As is set out in further detail below, the Defendants are seeking John Doe's dismissal or
suspension from Defendant WNEU because after Linda Loe told him she wanted to stop their
consensual mutual simultaneous oral sex, and he in fact did stop, he then supposedly
"coerced" Linda Loe into a sexual act by saying "Fine, but you have to finish me off" and
placing her hand on his penis.  According to the defendants, this violated a policy that did not
exist at the time of the sexual intimacy because the Defendant University did not create the
policy until *November 17, 2014*.

112.    Tellingly, the November 17, 2014 policy the Defendants are attempting to use in their
effort to dismiss or suspend John Doe from Defendant WNEU is mentioned **nowhere** in the
*2014-2015 Student Code of Conduct*.

113.    Yet as is set out below, in their report of investigation, the Defendants base their decision
to seek John Doe's dismissal or suspension from the Defendant University for an alleged
violation of a document entitled "Discrimination/Harassment/Sexual Misconduct/Title IX
Policy and Procedures," which was created after the incident in question on November 17,
2014.

**The Sanctions John Doe Is Facing
at the November 3, 2015 Hearing**

114.    Article VII of Section Three of the Student Code of Conduct is entitled "Range of
Sanctions."  Subpart A of Article VII is entitled:  "Dismissal from the University."  Subpart
A reads in its entirety on page 170:  "Dismissal is permanent removal from University
programs, facilities, and property without the privilege of re-admission or access.  This

23

sanction will be recorded in the student's file and on the student's transcript.  Notations in the transcript will be for a minimum length of time, to be designated by the hearing officer at the time other sanctions are imposed.  Once disciplinary actions against a student have been initiated, including the appeal process, a hold will be placed on any requests for transcripts.  The ranges of time that notations will remain on the transcript is as follows:

- Offenses against another person:  1–6 years;

- Offenses against property:  1–3 years;

- Offenses of possession:  1–3 years;

- Offenses that threaten campus order:  1–3 years; or

- Offenses of a criminal nature:  1–3 years

These time ranges may be assigned consecutively or concurrently.  A dismissed student may petition to delete this notation from her/his transcript after the length of time has elapsed."

115.    Subpart B of Article VII is entitled:  "Suspension from the University."  Subpart B reads in its entirety on page 170:  "Suspension from the University is a sanction for a stated period of time or until specific conditions have been met.  During the period of suspension, the student is not permitted to access the University property, facilities, or programs.  Suspension is noted in the student's file and on the student's transcript during the term of suspension.  If suspension occurs during a semester in progress, University practice mandates that all courses become administrative withdrawals."

## LINDA LOE'S FALSE ALLEGATION AND
## THE DEFENDANTS' BOTCHED INVESTIGATION

116.   Because John Doe and his counsel have not been provided with any of the documents

related to the Defendants' investigation, some of the dates that follow may be inaccurate, as

counsel and Mr. Doe are, for the most part, relying on their handwritten notes.

117.   The paragraphs that follow are based on counsels' handwritten notes of the documents

contained in a binder presented to John Doe and his counsel at the October 14, 2015 Pre-

Hearing Meeting (the "Partial Binder").

118.   That binder is referred to as the Partial Binder because during the October 14, 2015 Pre-

Hearing Meeting it became apparent that the General Counsel for the Defendant University

had a binder with *additional* documents in it (the "Complete Binder"), in violation of Title

IX, the Clery Act, the Clery Act Regulations, and Defendant WNEU's own policies and

procedures.

119.   Upon questioning by counsel for Mr. Doe, the General Counsel for the Defendant

University admitted that there were different and additional documents in the Complete

Binder, and that the Defendants would be using the Complete Binder at the upcoming

hearing as part of their efforts to have Mr. Doe dismissed or suspended from the Defendant

University.

120.   Counsel for Mr. Doe objected that he did not have all of the documents that were

available to the Defendant University's General Counsel, and which would be used by the

Defendants at the upcoming hearing, and asked that he be given a complete copy of the

Complete Binder.  The General Counsel for the Defendant University refused to do so.  Thus,

the facts that are discussed in the following paragraphs are based on counsel for Mr. Doe's

hand-made copies of the partial contents of the Partial Binder.

**June 15, 2015**

121.    On June 15 or 16, 2015, Linda Loe met with Defendant Ollson regarding her sexual

intimacy with John Doe that had occurred on the evening of September 26-27, 2014.

122.    Defendant Ollson drafted an interview summary memorializing her June 15, 2015

conversation with Linda Loe.

**June 22, 2015**

123.    Based on counsel for John Doe's handwritten notes, it appears that on June 22, 2015

Defendant Ollson may have finalized the summary of her interview with Linda Loe.

**July 1, 2015**

124.    On July 1, 2015, Defendant Hill wrote a letter to witness Emily Ells (a pseudonym)

seeking to interview Ms. Ells regarding Linda Loe's allegation.

125.    Defendant Hill's letter to Ms. Ells stated that Defendant Hill and Defendant Kenneally

would be in attendance at the interview "on behalf of the university."

126.    Defendant Hill's letter to Ms. Ells stated:  "We will be taking notes, and possibly

recording during the interview."  John Doe and his counsel, despite repeated requests, have

never been provided with either the interviewers' notes or any recordings of <u>any</u> of the

witnesses the Defendants interviewed.

**July 6, 2015**

127.    On July 6, 2015, Defendant Hill and Defendant Kenneally interviewed Emily Ells and

Fran Foe (a pseudonym) via FaceTime.

128.    Also on July 6, 2015, by letter, Stephen E. Spelman, counsel for John Doe, informed the

General Counsel of Defendant WNEU that he and his firm represented John Doe.

129.    In his July 6, 2015 letter, counsel for John Doe, pursuant to FERPA <u>and Defendant</u>

<u>WNEU's own policies,</u> requested <u>copies</u> of all records of Defendant WNEU relating to

allegations of misconduct against John Doe.  See Exhibit A, attached hereto.

130.    John Doe was and is entitled to copies of all of the items demanded in Exhibit A pursuant

to the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g(a)(4)(A); 34

C.F.R. subpart D; 34 C.F.R. § 99.3, 34 C.F.R. § 99.8(b)(2)(i) and (ii); 34 C.F.R. §§ 668.46(f)

and (k)(3)(i)(B)(*3*), and 45 C.F.R. §164.501, as the items are education records maintained

by Defendant WNEU that contain information directly related to John Doe.

131.    Pursuant to FERPA <u>and Defendant WNEU's own policies</u>, the Defendants were obligated

to provide John Doe with <u>copies</u> of the <u>first</u> set of requested records within 45 days – <u>no later</u>

<u>than August 20, 2015</u>.

132.    Pursuant to FERPA <u>and Defendant WNEU's own policies</u>, the Defendants were obligated

to provide John Doe with <u>copies</u> of <u>additional</u> records within 45 days of their creation.

133.    As of the date of the filing of this Verified Complaint, the Defendants have refused, and

continue to refuse, <u>contrary to FERPA and their own policies</u>, to provide John Doe with the

requested records.

**<u>July 10, 2015</u>**

134.    On July 10, 2015, Defendant Hill and Defendant Kenneally interviewed Greta Goe (a

pseudonym) via FaceTime.  Greta Goe is Linda Loe's current roommate.

135.    Also on July 10, 2015, Defendant Hill and Defendant Kenneally interviewed John Doe,

with both his counsel present and the General Counsel for the Defendant University present.

136.    Defendant Hill began the meeting by stating that she was a Title IX investigator for the

Defendant University and that her investigation would be "totally neutral."

137.   Defendant Hill then told John Doe that she wanted him to explain his "side of the story."

138.   Counsel for John Doe informed Defendant Hill that Mr. Doe could do no explaining as he

had not been informed what he was accused of.  Counsel for John Doe asked that Defendant

Hill provide Mr. Doe with whatever statement or statement summary the Defendants had, so

that Mr. Doe and his counsel could familiarize themselves with Linda Loe's allegation.

139.   Defendant Hill initially refused to provide the requested information, and insisted instead

that Mr. Doe describe his "side of the story" without reviewing anything.

140.   When counsel for John Doe informed Defendant Hill that Mr. Doe would say nothing

unless he got to see what he was being accused of by Linda Loe, Defendant Hill relented and

allowed Mr. Doe and his counsel to review a multi-page document that appeared to be a

summary drafted by Defendant Joanne Ollson of an interview she conducted with Linda Loe.

141.   Defendant Hill and the Defendant University's General Counsel refused to provide John

Doe or his counsel with a copy of Defendant Ollson's interview summary.

142.   Instead, Mr. Doe and his counsel were forced to read it together, in the presence of

Defendant Hill, Defendant Kenneally, and the Defendant University's General Counsel.

143.   Because the Defendants would not provide John Doe or his counsel with a copy of

Defendant Ollson's interview summary, counsel for Mr. Doe was required to copy the entire

document by hand.

144.   Counsel for Mr. Doe did not make a verbatim copy of the interview summary, but only

transcribed the main elements of the lengthy document.  Nevertheless, his handwritten

single-space notes took up six pages of note paper.

145.   At one point, because of the time it was taking for counsel for Mr. Doe to copy the

lengthy interview summary by hand, Defendant Hill began yelling at John Doe, aggressively

insisting that he could not take any more time to review Defendant Ollson's interview summary, and that he had to immediately start answering her questions.

146.    Counsel for Mr. Doe immediately informed Defendant Hill that he would not allow her to bully his client, and that her yelling and aggressive attempt to bully Mr. Doe demonstrated that she absolutely was <u>not</u> a "neutral" investigator.

147.    Following the intervention of counsel for Mr. Doe, Defendant Hill backed down and ceased her yelling and attempted bullying of Mr. Doe.

148.    In a memo dated July 10, 2015, Defendant Kenneally acknowledged that counsel for Mr. Doe had told Defendant Hill to stop bullying Mr. Doe.  A copy of the Defendant Kenneally's memo is attached hereto as Exhibit D.

149.    After copying the gist of Defendant Ollson's interview summary, and after speaking privately with Mr. Doe, counsel for Mr. Doe requested that he be given copies of all documents relating to the investigation, including witness statements, text messages, social media postings, photos, and all digital evidence.  See Exhibit D.

**July 14, 2015**

150.    On July 14, 2015, Defendant Hill and Defendant Kenneally interviewed Linda Loe.

151.    The interview summary prepared by Defendant Hill and Defendant Kenneally includes portions containing Linda Loe's pejorative opinions about John Doe, which have <u>nothing</u> to do with "the situation," and the inclusion of which violates WNEU's policies against "character evidence."

152.    John Doe and his counsel, despite repeated requests, have not been provided with a copy of this lengthy interview summary, and were forced to copy it by hand.

153.   According to the interview summary, Linda Loe told Defendant Hill and Defendant Kenneally that on the night in question, her T-shirt and yoga [pants] were <u>not</u> torn.

154.   According to the interview summary, Linda Loe told Defendant Hill and Defendant Kenneally that she remembered John Doe getting undressed, but could not remember if she undressed herself.

155.   According to the interview summary:  "During the interaction [Linda] remembers the door open to the room and quickly close.  She was not sure who opened the door.  [Linda] stated that she <u>did not react to the door opening</u> and believes that she did not react because she was 'shocked by what was happening' and stated '<u>she felt paralyzed when the door opened</u>.'" (emphasis supplied)

156.   This is ***<u>directly</u>*** <u>contrary to Linda Loe's text messages on the night in question</u> as it is a <u>far</u> cry from her text message that she sent to Amy Ames stating: "Literally someone was knocking and <u>we threw the covers over us</u> and then they didn't come in and then all of a sudden some girl walks in…." (emphasis supplied)

157.   According to the interview summary, Linda Loe told Defendant Hill and Defendant Kenneally that she had only "one alcoholic beverage"

158.   According to the interview summary, Linda Loe also told Defendant Hill and Defendant Kenneally that she now has "triggers" regarding people with the same color hair as John Doe.

159.   Yet despite Linda Loe's claimed "triggers," a photograph provided to the Defendants by Emily Ells shows Linda Loe and the red-haired John Doe together at a Halloween party, a month after the incident in question, both with big smiles on their faces.

160.   Later on July 14, Linda Loe emailed Defendant Hill, attaching a copy of her telephone records.  Counsel for John Doe is uncertain which telephone records these may be, since they

were able to review only a copy of the email, and do not believe that these telephone records were contained in the Partial Binder.

**July 17, 2015**

161.    On July 17, 2015, Defendant Hill emailed Linda Loe to tell her that the Defendants would be talking with three additional student witnesses.

162.    Defendant Hill did not provide John Doe or his counsel with the same information.

**July 27, 2015**

163.    On July 27, 2015, Defendant Ollson approved a months-long extension of the time the Defendants had given themselves to complete their investigation.

164.    The General Counsel for the Defendant University later told John Doe and his counsel that this extension was required because of the difficulty in interviewing witnesses during the summer break.

165.    Upon learning this, counsel for Mr. Doe requested a similar extension in order to complete his investigation on behalf of Mr. Doe, stating that it was unfair and illegal that the Defendant University had given itself an extension to prepare its case but would not grant one for Mr. Doe.  Nevertheless, the Defendants refused to grant Mr. Doe a similar extension.

**August 5, 2015**

166.    On August 5, 2015 Linda Loe emailed Defendant Hill and told her that she had looked through the text messages on her cell phone but that she was unable to find the text messages she had exchanged with her current roommate Greta Goe the morning after her sexual intimacy with John Doe because she "by accident deleted all of my texts between us one day."

167.    Counsel for John Doe believe that the text messages to Greta Goe still exist on Linda

Loe's cell phone, as counsel have had many cases in which "deleted" text messages can be

easily retrieved from a cell phone handset with fairly simple digital forensic programs.

168.    Because they believe that Linda Loe's "accidentally deleted" text messages with Greta

Goe will be exculpatory, similar to Linda Loe's texts to Amy Ames and Brenda Boe, counsel

for Mr. Doe have repeatedly asked the Defendants to provide them with access to both Linda

Loe's cell phone and the thumb drive containing the text messages, so that their computer

forensic expert can mirror the hard drive on Linda Loe's phone and examine the thumb drive

to recover the messages.  The Defendants have refused to allow counsel for Mr. Doe to have

access to the cell phone or the thumb drive.

**September 1, 2015**

169.    On September 1, 2015, Defendant Hill and Defendant Kenneally again interviewed Linda

Loe.

170.    Analysis of the interview summary prepared by Defendant Hill and Defendant Kenneally

shows that Linda Loe's statement contains multiple inconsistencies with respect to her earlier

statements, is replete with absolute contradictions regarding the multiple text messages she

sent the morning after her sexual intimacy with John Doe, and provides descriptions of her

sexual activities with Mr. Doe that evening that are physically impossible to accomplish.

171.    Nevertheless, the Defendants failed to confront Linda Loe about these many

inconsistencies, contradictions, and impossibilities.

172.    Also on September 1, 2015, Defendant Hill sent an email to Defendant Ollson and

Defendant Kenneally referring to Attorney Stephen Spelman, one of the counsel for John

Doe.  In her email she stated that with respect to the Defendants' investigation, "his attorney

can't act as his attorney."  This shows an absolute lack of knowledge, by a supposedly

trained Title IX investigator, of a fundamental right granted to students by the Clery Act with

respect to the participation of their attorney in <u>all</u> "proceedings," a defined term in the Clery

Act Regulations that includes essentially *every event* related to on-campus sexual allegations.

173.   <u>Of far graver concern</u>, when, on the same day, a subordinate of Defendant Ollson's

suggested that John Doe should be offered the same opportunity to seek "no-contact"

accommodations as Linda Loe had been, <u>as is required by Title IX and the Clery Act</u>

<u>Regulations</u>, Defendant Ollson, <u>who is the Defendant University's "Title IX Officer" *refused*</u>

<u>*to do so*, stating that John Doe should be forced to request the measures on his own</u>.  This is a

<u>clear</u> violation of Title IX and the Clery Act, and demonstrates the Defendants' <u>absolute bias</u>

<u>and willingness to discriminate and retaliate against John Doe, simply because he is a male</u>.

**September 8, 2015**

174.   On September 8, 2015, the Defendants apparently extracted some information from

Linda Loe's cell phone.

175.   At some point, the Defendants consulted with Kathleen Reid, a Nurse Practitioner

employed by the Defendant University, pertaining to an amount of blood found on John

Doe's sheets, approximately 3" in diameter.  The report written by Defendant Hill and

Defendant Kenneally at the close of their investigation stated that Reid said that it was highly

unlikely could have emitted the quantity of blood of 3" diameter to penetrate John Doe's

mattress pad.  It is unclear from the Defendants' report what Reid may have looked at, and

how she knew (or supposed) that there was a 3" diameter blood stain (apparently on John

Doe's bedding).  Certainly there is nothing in the Partial Binder referring to any statements

by witnesses about an amount of blood, and how it apparently reached a mattress pad.   In

any event, the Defendants' refusal to allow counsel for John Doe to interview Reid is in

direct contradiction of the requirements of Title IX.

**September 24, 2015**

176.    On September 24, 2015 – Defendant Hill and Defendant Kenneally wrote to the

Admissions Department at Defendant WNEU, asking to see John Doe's and Linda Loe's

recommendation letters, admissions essays, and financial aid packages.

177.    It is unclear what relevance such information could possibly have to an alleged sexual

assault investigation, other than an attempt by Defendant Hill and Defendant Kenneally to

determine which of the two students might be more "connected" or financially secure.

178.    It is unclear whether the Admissions Department at Defendant WNEU provided the

requested information to Defendant Hill and Defendant Kenneally.

179.    If the requested information is contained in the Partial Binder, it must be in the portion of

the binder that counsel for Mr. Doe did not have time to review.

**THE OCTOBER 14, 2015 PRE-HEARING MEETING**

180.    The Defendants conducted a "Pre-Hearing Meeting" on October 14, 2015, beginning at

2:10 p.m.  John Doe and his counsel were present, as were the General Counsel for the

Defendant University and Defendant Hendricks.  The meeting took place in a small office,

with the four attendees seated around a small table.

**The Defendants Illegally Presume Mr. Doe to Be Guilty
and Shift the Burden of Proof and Production To Him
Simply Because He is a Male**

181.    During the October 14, 2015 Pre-Hearing Meeting, the General Counsel for Defendant

WNEU repeatedly told counsel for John Doe that John Doe was in the predicament he was in

because Mr. Doe had "failed to come forward" to provide his own statement about what had happened.

182.   By stating that the plaintiff had somehow disadvantaged himself because he had "failed to come forward" to give a statement, the General Counsel for Defendant WNEU clearly demonstrated that contrary to Title IX, the Clery Act, the Clery Act Regulations, and the Defendant University's own policies and procedures, it is Defendant WNEU's position that far from being presumed to be innocent, John Doe, as the male, is presumed to be guilty.

183.   By stating that John Doe had somehow disadvantaged himself because he had "failed to come forward" to give a statement, the General Counsel for Defendant WNEU also clearly demonstrated that contrary to Title IX, the Clery Act, the Clery Act Regulations, and the Defendant University's own policies and procedures, it is actually Defendant WNEU's position that the burden of proof and the burden of production in this matter have always been, and will always be, on John Doe.

**The Defendants Reveal That**
**They Are Not Neutral and Impartial**

184.   At the meeting, Defendant Hendricks told John Doe and his counsel that there would be two Hearing Officers who would act as judges at the hearing, one male and one female.

185.   Defendant Hendricks told John Doe and his counsel that Defendant Hill would present the case against him on behalf of the Defendant University.

186.   Defendant Hendricks told Mr. Doe directly:  "It's the University versus the student."

187.   Defendant Hendricks also told Mr. Doe that the Hearing Officers "will hear your side of the story and the University's side of the story."

188.   These two statements by Defendant Hendricks absolutely demonstrate that contrary to the requirements of Title IX, the Clery Act Regulations, and Defendant WNEU's own policies

and procedures, the Defendants are in fact <u>not</u> neutral and impartial with respect to their

investigation and attempted discipline of Mr. Doe, and that the Defendants' investigation is

inadequate, unreliable, and is biased against Mr. Doe because he is a male.

**<u>The Defendants Admit That</u>**
**<u>Mr. Doe Has a Right to Due Process</u>**

189.     Defendant Hendricks also told John Doe that if he wanted to, instead of having to have

his counsel attempt to hand-copy and then review the materials in the Partial Binder, Mr. Doe

could instead choose not to have a hearing and by doing so "waive his right to due process."

190.     By telling John Doe that he could "waive his right to due process," the Defendants in fact

established that Defendant WNEU's policies and procedures, along with Title IX, the Clery

Act, the Clery Act Regulations, and FERPA, guarantee that John Doe has a <u>right</u> to due

process.

**<u>One of the *Two* "Neutral" Hearing Officers is the</u>**
**<u>*Subordinate* of Defendant Hill and Defendant Ollson</u>**

191.     Finally, <u>and astonishingly</u>, Defendant Hendricks informed John Doe and his counsel that

one of the two supposedly "neutral" Hearing Officers appointed to determine whether to

uphold the finding of Defendant Hill and Defendant Ollson that John Doe should be

dismissed or suspended would be an individual named Sean Burke.

192.     Sean Burke holds the title of "Associate Director of Residence Life for Operations" at

Defendant WNEU.  As such, he is on the staff of Defendant WNEU's "Residence Life"

department.

193.     Defendant Hill holds the title of "Senior Associate Director of Residence Life" at

Defendant WNEU.  She is also on the staff of Defendant WNEU's "Residence Life"

department, as Mr. Burke's superior.  See web page printout, printed on October 16, 2015, attached hereto as Exhibit E.

194.    Defendant Ollson, in addition to holding the title of "Assistant Vice President and Director of Human Resources" at Defendant WNEU, is also serves as the "Title IX Officer" for Defendant WNEU.  See page 191 of Exhibit B and page 190 of Exhibit C.

195.    Sean Burke serves as the "Deputy Title IX Officer," directly subordinate to Defendant Ollson.  See page 191 of Exhibit B and page 190 of Exhibit C.

196.    Therefore, Sean Burke is the *direct* subordinate of *both* Defendant Hill, who *conducted* the investigation of Linda Loe's allegation, and Defendant Ollson, who *supervised* the conduct of the investigation, and it is reasonable to believe *approved* Defendant Hill's findings.

197.    **Even more problematically, Defendant Hill will be presenting the Defendant University's case against John Doe *for a decision by her own subordinate*.**

198.    By selecting the direct subordinate of Defendant Ollson and Defendant Hill to be one of the two Hearing Officers, the Defendants have clearly demonstrated that their entire process has been biased, unfair, prejudicial, contrary to law, contrary to their own polices, and nothing but a sham that flies in the face of the very due process that Defendant WNEU guarantees to its students.

199.    Moreover, defendant Hendricks informed John Doe and his counsel that Mr. Burke and the other hearing officer "will be the ones who will ultimately be making the decision.  The decision will not be passed on to some other person."  Thus it is clear how powerfully unfair and biased it is to Mr. Doe that one of the administrators deciding his fate is the direct

subordinate of both Defendant Ollson and Defendant Hill, both of whom have <u>already</u>
<u>decided that the Defendant University should dismiss or suspend him</u>.

**Mr. Doe's Counsels' Review and**
**Hand Copying of the Partial Binder**

200.    Following Defendant Hendricks' above statements to John Doe, Mr. Doe and his counsel
began to review the content of the Partial Binder.

201.    John Doe and his counsel were forced to review the documents in the small office, within
inches of the Defendant University's General Counsel, and within feet of Defendant
Hendricks.  Thus, there was <u>no</u> opportunity for counsel to privately communicate with John
Doe during the document review.

202.    When counsel for the plaintiff objected to the General Counsel of the Defendant
University regarding the extraordinarily short timeframe to hand-copy the hundreds of pages
of documents and then respond to the deadline to provide a witness list and written copies of
opening and closing statements, the General Counsel's only reply was:  "That's not our
problem."

203.    When counsel for the Plaintiff again objected to the requirement of hand-copying the
hundreds of pages of documents in such a short time period, the General Counsel for the
Defendant University stated:  "We determine what ample time is to review the materials."

204.    Counsel for Mr. Doe then objected that Defendant Hill, who will be presenting the
University's case against Mr. Doe, will have copies of all the documents in the Complete
Binder, some of them unknown to Mr. Doe and his counsel, and Mr. Doe will have copies of
<u>no</u> documents.  The General Counsel for the Defendant University replied to this by stating,
"It's not negotiable."

205.    Not having any documents to review prior to the hearing prevents counsel for Mr. Doe

from having sufficient time to digest the content of the hand-copied materials with respect to

the facts, the law, and Defendant WNEU's policies and procedures, much less discuss these

complex issues and potentially life-altering issues with Mr. Doe.

206.    Moreover, during the review of the information in the Partial Binder on October 15,

2015, counsel for John Doe realized that the Defendants had had access to, and had

apparently reviewed, hundreds of audio messages from Linda Loe's cell phone and perhaps

other phones as well.  Counsel for John Doe requested copies of the audio messages, which

dated beginning September 1, 2014.  The fact that the audio messages begin on this particular

date is strongly suggestive of a directed and targeted search for audio data by the Defendants,

as the incident in question occurred on September 26, 2014.  Despite the readily apparent

relevance of the audio recordings, and despite the fact that it appears that the Defendants

themselves had conducted a targeted search for the audio information, the Defendants have

refused to provide John Doe and his counsel with the data.

207.    Also during the review of the information in the Partial Binder on October 15, 2015,

counsel for John Doe also realized that the Defendants had had access to, and had apparently

reviewed, thousands of text messages and photographs from Linda Loe's cell phone and

perhaps other phones as well.  Counsel for John Doe requested copies of the photographs, as

well as the opportunity to review them, in private, with Mr. Doe.  The Defendants refused

this request, even though they had had access to this information as part of their

investigation.

208.    The following day, on October 16, was the first time that counsel for John Doe had seen

the text messages that Linda Loe had sent to Amy Ames and Brenda Boe.

209.    Counsel asked the General Counsel for copies of the Snapchat photos that Linda Loe told

Amy Ames she had taken of "that guy" last night….."

210.    Defendant Hendricks at first maintained that the Snapchat photographs were not

available, but counsel for John Doe referred her to the Snapchat.com website, which states

that Snapchat photos remain on the sender's phone.

211.    Counsel for Mr. Doe then repeated his request for the Snapchat photos and was told by

the General Counsel of the Defendant University that with her and Defendant Hendricks

present, he could use Defendant Hendrick's computer to look at the thousands of photos that

were on the thumb drive to attempt to ascertain if any of them were the Snapchat photos from

the night in question.

212.    Counsel for Mr. Doe informed the General Counsel for the Defendant WNEU that based

on his experience with Snapchat photos on other cases, he was fairly confident that the

photos would be on Linda Loe's cell phone with a identifying suffix that would not typically

allow a program to discover the photos, and for that reason he yet again requested that the

phone's hard drive be mirrored for examination by his digital forensic expert.  The General

Counsel for the Defendant WNEU refused.

213.    At one point on October 16, 2015, after extensive copying of notes, counsel for John Doe

asked the General Counsel for the Defendant WNEU if he could dictate his notes into his

phone, which would be much quicker, and quite frankly by this point his hand and wrist were

sore.  General Counsel for the Defendant WNEU refused to allow him to do this.

214.    On October 19, 2015, at 10:46 a.m., counsel for Mr. Doe were informed that they could

no longer review the materials in the Partial Binder.  Counsel informed the General Counsel

of Defendant WNEU that they had not been able to complete a review of the entire paper

contents of the Partial Binder (and had not reviewed the contents of the thumb drive <u>at all</u>). Despite this, the Defendants provided no further time to review the materials in the Partial Binder.

215.    Counsel for John Doe then asked that their medical forensic expert be allowed to examine the sheets that Nurse Practitioner Reid had apparently examined.  The Defendants also denied this request.

## DEFENDANT HILL AND KENNEALLY'S REPORT

216.    The first document in the Partial Binder was a report written by Defendant Hill and Defendant Kenneally, dated September 24, 2015.

217.    John Doe and his counsel were not allowed to have a copy of the September 24, 2015 report.

218.    It is unclear why John Doe and his counsel were not informed of the report, and given a chance to look at it, until October 14, 2015.

219.    Counsel for John Doe was allowed to hand-copy the report.  Given the restricted time limitations, counsel for John Doe did not have sufficient time to hand-copy the entire report.

220.    The September 24, 2015 report has several sections.

## The "Standard of Proof" Section

221.    One section of the report is entitled "Standard of Proof."  In addressing the standard of proof to be used by the Hearing Officers in this matter – a preponderance of the evidence – the report states:  "This statement is often referred to as '50% plus a feather.'"

**The "Credibility Assessment" Section**

222.   In the "Credibility Assessment" section of the September 24, 2015 report, the Defendants found Linda Loe to be credible because with respect to her sexual intimacy with the Plaintiff, her "initial report did not change."

223.   Yet Linda Loe, in her multiple statements, <u>did</u> change her report, and change it <u>significantly</u>.

224.   First, in Linda Loe's initial report, she <u>failed</u> to include that she consented to the Plaintiff performing oral sex on her.

225.   Second, in Linda Loe's initial report, she <u>failed</u> to include that <u>two</u> other people had entered the room while she was engaged in sexual intimacy with the Plaintiff.

226.   Third, Linda Loe's contemporaneous, celebratory text messages <u>utterly</u> contradict her later statements.

**The "Coercion Analysis" Section**

227.   The next section was "Coercion Analysis."  It is in this section that the investigators make their finding that John Doe used coercion on Linda Loe to receive a sexual act, and that John Doe should thus be dismissed or expelled from the University.

228.   The paragraphs that follow regarding the "Coercion Analysis" section of the Defendants' report, although they address the merits or lack of merit of Linda Loe's allegation, are not included for that specific purpose.  Rather, they are included to show how incredibly flawed the Defendants' <u>process</u> was with respect to the allegations, to the extent that the Defendants' have illegally violated John Doe's <u>right to due process</u>, hence allowing the Court to grant all of the requested relief.

229.    In the "Coercion Analysis" section of their report, Defendant Hill and Defendant
Kenneally state that <u>one</u> act of sexual intimacy between Linda Loe and John Doe was
"coerced" because of what they termed the "isolation and intensity" of the situation, even
though two people, one male student and one female student, had separately entered the room
while Linda Loe and John Doe were together.

230.    The document that Defendant Hill and Defendant Kenneally reference to draw their
"coercion" "standard" from is a document published by Defendant WNEU entitled
"Discrimination/Harassment/Sexual Misconduct/Title IX Policy and Procedures," dated
November 17, 2014.  A copy of the document is attached hereto as Exhibit F.

231.    Yet Exhibit F itself states that at least part of it was revised as of July 15, 2015 (including
the portion on page 3 containing the fleeting reference to coercion), while other parts were
revised as of November 17, 2014.

232.    **<u>Critically,</u>** Exhibit F itself states on page 12, in the last line of the document, that:  "This
policy was updated and implemented in **November, 2014**."  (bold in **original**).

233.    Thus, the policy that is Exhibit F <u>cannot</u> apply to Mr. Doe's case, because the Defendant
University itself has stated that his case will be governed by the *2014-2015 Student
Handbook*, which was created and implemented <u>before</u> the policy that is Exhibit F was
created, and does not refer to Exhibit F **<u>anywhere</u>**.

234.    Despite this, in their September 24, 2015 report, defendant Hill and Defendant Kenneally
use the July 2015/November 2014 policy to find coercion, using tortured logic to maintain
that because while Linda Loe and John Doe were simultaneously and mutually performing
consensual oral sex on each other and Linda Loe said she wanted to stop, and even though
John Doe immediately <u>did stop</u> performing oral sex on Linda Loe, the "situation" was

nevertheless "coercive" under the July 2015/November 2014 policy because <u>upon stopping</u>, John Doe said, "Fine, but you have to finish me off," and then placed her hand on his penis.

235.    Of course, this supposed type of "coercion" is not <u>addressed</u> **anywhere** in the *2014-2015Student Code of Conduct*, much less <u>forbidden</u>.  Instead, as is set forth above, the relevant standard to evaluate <u>both</u> Linda Loe's and John Doe's conduct comes from Subsection A of Article III of the *2014-2015Student Code of Conduct,* so thus the question becomes whether Linda Loe could exercise "reasonable judgment under the circumstances" as long as she was "not impaired by intoxication."

236.    As is set forth above, Linda Loe has admitted to the investigators that she was not "impaired by intoxication."

237.    And, as is made clear from her text messages immediately after the incident, she certainly was capable of "reasonable judgment," as she sent coherent, up-beat messages to two, and possibly more of her friends, regarding her enthusiasm for the sexual intimacy she had just been involved in with John Doe.

238.    **<u>Significantly</u>**, she also demonstrated her exercise of "reasonable judgment" when she <u>criticized</u> John Doe in her text message of 7:46 a.m. to Amy Ames, stating:  "<u>He wasn't even good</u>."

239.    Thus, the Defendants' attempt to use the standard in the July 2015/November 2014 policy is illegal, biased, and discriminatory towards Mr. Doe.

240.    But Defendant Hill's and Defendant Kenneally's illegal attempt to use a non-relevant policy is far from the only procedural problem with their conclusion of "coercion."

241.    The two state in their report that "based upon a preponderance of the evidence standard" this was coercion on John Doe's part in light of Linda Loe's "<u>refusal to engage in penis/vaginal sex</u>."  (emphasis supplied)

242.    **Yet at no time***, and nowhere in their own report,* **had anyone** alleged, certainly not Linda Loe, and certainly not either of them, that Linda Loe's refusal to engage in vaginal intercourse had **anything** to do with what *they* describe as John Doe's supposedly "coercive" conduct.

243.    This absolutely demonstrates that the investigation fails to live up to the standards required by Title IX, the Clery Act, the Clery Act Regulations, and the Defendant University's own policies and procedures.

## **INJURIES TO JOHN DOE**

244.    Because of the Defendants' illegal, biased, and prejudicial acts, John Doe is constantly fearful, cannot sleep, and is depressed and anxious.

245.    Mr. Doe's grades are suffering, he is scared about his future, and he is extraordinarily worried about his parents, who are middle-class people who do not have a lot of money, and who themselves are worried sick.  Every time he speaks with his mother and father there is crying, because they all are scared about the life-long ramifications and consequences of this false allegation.

246.    Dismissal or suspension from a university can be life-altering and have negative consequences that last for years, and even decades.  Thus, it is critical that Defendant WNEU follow fair procedures and provide full due process, as federal law, state law, and Defendant WNEU's own policies provide.  Because of the Defendants' illegal and biased actions to

date, Mr. Doe is rightly terrified that the Defendants' will continue to take illegal actions against him that will result in his unjust dismissal or suspension.

## CONCLUSION

247.    As is described above, in the course of their response to Linda Loe's allegation, the Defendants have violated federal law and regulations, violated Massachusetts law, and violated WNEU's own policies and procedures.  These violations deprived John Doe of the most basic due process and equal protections rights.

248.    The Defendants have conducted a biased investigation in violation of Defendant WNEU's own procedures and policies regarding investigation of alleged sexual assaults.

249.    In the course of the investigation, the supposedly "neutral" investigators have repeatedly exhibited hostility and contempt for John Doe whenever John Doe attempted to exercise the rights granted to him by federal law, state law, and Defendant WNEU's own procedures, including an attempt to bully the Plaintiff into giving a statement before fully reading the initial allegations against him.

250.    The Defendants actions have discriminated against the Plaintiff on account of his gender, in violation of law.

251.    The Plaintiff has been greatly damaged by the Defendants, both because he is facing a biased and unfair hearing, and because has suffered psychological, emotional, and physical ill health caused by the Defendants' biased and improper conduct.

252.    Counsel to Mr. Doe cannot act as "advisors" as defined under the Clery Act if counsel are not provided with the materials that will be used against their client and are not even informed of what the content of those materials might be.

253.    Moreover, over a period of months, the Defendants conducted <u>lengthy</u> interviews with

many witnesses, while counsel for Mr. Doe is not allowed to interview <u>any</u> witnesses.

254.    Even so, it is clear that the Defendants' investigation has been biased against John Doe

because he is a male.  From Linda Loe's own multiple statements, it is clear that **<u>each time</u>**

**<u>Linda Loe said no, John Doe stopped – but the investigators never say </u>that**.  By leaving

out <u>leaving </u>out this conclusion, the Defendants demonstrate shows their bias and lack of

impartiality.

255.    Despite the fact that the Defendants had taken months to investigate the facts, including

giving themselves a <u>months-long</u> extension to complete the investigation on behalf of the

Defendant University, the Defendants refused, multiple times, to allow John Doe and his

counsel <u>any</u> extension of time to conduct <u>their</u> investigation.

256.    Defendant Hill, who will be presenting the Defendant University's side of the story to the

Hearing Officers has <u>copies</u> of <u>all</u> the documents available in the case, and <u>will have copies</u>

<u>of those documents to use during her presentation of the University's case against the</u>

<u>plaintiff</u>.  The Plaintiff has <u>no</u> copies of <u>any</u> of the documents, which include <u>all witness</u>

<u>statements</u>, emails, <u>text message transcripts</u>, and <u>the investigators' report and conclusions</u>.

257.    The Defendants' entire process is foul, and if not enjoined by this Court, the so-called

"hearing" will be nothing but a sham.

### FIRST CAUSE OF ACTION
### <u>TITLE IX</u>

258.    The Plaintiff hereby incorporates and adopts each and every allegation in the preceding

paragraphs of this Verified Complaint.

259.    As is set forth above, the Defendants' investigation of Linda Loe's allegation against

John Doe was and is inadequate, unreliable, biased against John Doe because he is a male,

partial towards Linda Loe because she is a female, and failed (and will fail) to allow John

Doe the equal opportunity to present witnesses and other evidence at any hearing.

260.    Pursuant to Title IX, the Defendants are prohibited from subjecting Plaintiff John Doe to

a disciplinary hearing where his sex is a motivating factor in the Defendants' decision to

impose sanctions.

261.    Pursuant to Title IX, the Defendants are further prohibited from providing a disciplinary

proceeding that is not adequate, reliable, impartial, and equitable, and which allows John Doe

the equal opportunity to present witnesses and other evidence.

262.    The Defendants violated John Doe's right to be free from discrimination on the basis of

sex by subjecting him to an investigation and pending disciplinary proceeding marked by the

aforementioned procedural flaws that have resulted, and almost certainly will result in an

innocent person being wrongly found to have committed an offense.

263.    Such conduct is in violation of Title IX, as it is discriminatory towards the plaintiff on the

account of his sex.

264.    As a direct and proximate result of the Defendants' violation of Title IX, the Plaintiff

suffered the harms described above, including, without limitation, emotional distress, loss of

educational opportunities, economic injuries, and other direct and consequential damages,

including physical, psychological, emotional, and reputational damages.

## SECOND CAUSE OF ACTION
## THE CLERY ACT

265.    The Plaintiff hereby incorporates and adopts each and every allegation in the preceding

paragraphs of this Verified Complaint.

266.    As is set forth above, the Defendants' investigation of Linda Loe's allegation against

John Doe was and is inadequate, unreliable, biased against John Doe because he is a male,

partial towards Linda Loe because she is a female, and failed (and will fail) to allow John

Doe the equal opportunity to present witnesses and other evidence at any hearing.

267.    The Defendants' procedures violated numerous aspects of the Clery Act Regulations, to

John Doe's detriment by subjecting him to an investigation and pending disciplinary

proceeding marked by the aforementioned procedural flaws that have resulted, and almost

certainly will result in an innocent person being wrongly found to have committed an

offense.

268.    In violation of the Clery Act Regulations the Defendants: failed to provide a prompt, fair,

and impartial process from the initial investigation to the final result; failed to have the

investigation conducted by officials who do not have a conflict of interest or bias for or

against the accused; failed to conduct an investigation that was in <u>any</u> way transparent to the

accused; and failed to provide the accused timely and equal access to any and all of the

information that would be used by the Defendants during the informal and formal

disciplinary meetings and hearings.

269.    As a direct and proximate result of these acts and omissions the Plaintiff has suffered and

continues to suffer the harms and damages described above.

### THIRD CAUSE OF ACTION
### <u>FERPA</u>

270.    The Plaintiff hereby incorporates and adopts each and every allegation in the preceding

paragraphs of this Verified Complaint.

271.    As is set forth above, the Defendants failed to provide John Doe with copies of his

educational records, in violation of FERPA and of Defendant WNEU's own policies and

procedures.

272.    The Defendants' failure to comply with FERPA redounded to John Doe's extreme

detriment as he has been unable to adequately prepare his defense against Linda Loe's false

allegation as the Defendants have utterly refused to provide him, as required, with copies of

his educational records.

273.    As a direct and proximate result of these acts and omissions the Plaintiff has suffered and

continues to suffer the harms and damages described above.

## FOURTH CAUSE OF ACTION
## BREACH OF CONTRACT: 2014-2015 STUDENT HANDBOOK

274.    The Plaintiff hereby incorporates and adopts each and every allegation in the preceding

paragraphs of this Verified Complaint.

275.    The Plaintiff paid Defendant WNEU sums of money for his education, and in return,

Defendant WNEU contracted to provide the Plaintiff with access to its undergraduate

program in accordance with the terms and conditions in the 2014-2015 Student Handbook.

276.    The relationship between the parties is contractual in nature, and each party owes the

other party certain duties, some of which can be found in the 2014-2015 Student Handbook.

277.    Defendant WNEU breached its contract with the Plaintiff by failing to comply with its

own policies and procedures as set out in the 2014-2015 Student Handbook.

278.    As a direct and proximate result of these acts and omissions the Plaintiff has suffered and

continues to suffer the harms and damages described above.

## FIFTH CAUSE OF ACTION
## BREACH OF CONTRACT: 2015-2016 STUDENT HANDBOOK

279.    The Plaintiff hereby incorporates and adopts each and every allegation in the preceding

paragraphs of this Verified Complaint.

280.   The Plaintiff paid Defendant WNEU sums of money for his education, and in return, Defendant WNEU contracted to provide the Plaintiff with access to its undergraduate program in accordance with the terms and conditions in the 2015-2016 Student Handbook.

281.   The relationship between the parties is contractual in nature, and each party owes the other party certain duties, some of which can be found in the 2015-2016 Student Handbook.

282.   Defendant WNEU breached its contract with the Plaintiff by failing to comply with its own policies and procedures as set out in the 2015-2016 Student Handbook.

283.   As a direct and proximate result of that breach the Plaintiff suffered the harms described above, including, without limitation, emotional distress, loss of educational opportunities, economic injuries, and other direct and consequential damages.

284.   As a direct and proximate result of these acts and omissions the Plaintiff has suffered and continues to suffer the harms and damages described above.

## SIXTH CAUSE OF ACTION
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING:
## 2014-2015 STUDENT HANDBOOK

285.   The Plaintiff hereby incorporates and adopts each and every allegation in the preceding paragraphs of this Verified Complaint.

286.   Every contract contains within it an implied covenant of good faith and fair dealing.

287.   Defendant WNEU breached that covenant of good faith and fair dealing by not following the policies and procedures set out in the 2014-2015 Student Handbook, and by pursuing an investigation and adjudication in an unfair and biased manner.

288.   As a direct and proximate result of these acts and omissions the Plaintiff has suffered and continues to suffer the harms and damages described above.

## SEVENTH CAUSE OF ACTION
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING:
## 2015-2016 STUDENT HANDBOOK

289.    The Plaintiff hereby incorporates and adopts each and every allegation in the preceding

paragraphs of this Verified Complaint.

290.    The Plaintiff hereby incorporates and adopts each and every allegation in the preceding

paragraphs of this Verified Complaint.

291.    Every contract contains within it an implied covenant of good faith and fair dealing.

292.    Defendant WNEU breached that covenant of good faith and fair dealing by not following

the policies and procedures set out in the 2014-2015 Student Handbook, and by pursuing an

investigation and adjudication in an unfair and biased manner.

293.    As a direct and proximate result of these acts and omissions the Plaintiff has suffered and

continues to suffer the harms and damages described above.

## EIGHTH CAUSE OF ACTION
## NEGLIGENCE

294.    The Plaintiff hereby incorporates and adopts each and every allegation in the preceding

paragraphs of this Verified Complaint.

295.    The Defendants owed duties of care to the Plaintiff.  Such duties included, without

limitation, a duty of reasonable care in conducting an investigation of an allegation of sexual

misconduct against him.

296.    The Defendants breached their duties owed to the Plaintiff.

297.    As a direct and proximate result of these acts and omissions the Plaintiff has suffered and

continues to suffer the harms and damages described above.

## NINTH CAUSE OF ACTION
## ESTOPPEL AND RELIANCE

298.    The Plaintiff hereby incorporates and adopts each and every allegation in the preceding

paragraphs of this Verified Complaint.

299.    Defendant WNEU's various policies constitute representations and promises that

Defendant WNEU should have reasonably expected to induce action or forbearance by the

Plaintiff.

300.    Defendant WNEU should have reasonably expected or should have expected the Plaintiff

to accept its offer of admission, incur tuition and fees expenses, and choose not to attend

other colleges based on its express and implied promises that Defendant WNEU would not

deny him his procedural rights should he be accused of an offense under the Student Code of

Conduct.

301.    The Plaintiff relied to his detriment on those express and implied promises and

representations made by Defendant WNEU.

302.    Based on the foregoing, Defendant WNEU is liable to the Plaintiff based on Reliance and

Estoppel.

303.    As a direct and proximate result of the above conduct the Plaintiff suffered the harms

described above, including, without limitation, emotional distress, loss of educational

opportunities, economic injuries, and other direct and consequential damages.

304.    As a direct and proximate result of these acts and omissions the Plaintiff has suffered and

continues to suffer the harms and damages described above.

## TENTH CAUSE OF ACTION
## <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>

305.     The Plaintiff hereby incorporates and adopts each and every allegation in the preceding

paragraphs of this Verified Complaint.

306.     Under Massachusetts law, a person may not intentionally inflict emotional distress upon

another.

307.     The above-described actions on the part of the Individual Defendants were extreme and

outrageous, beyond all possible bounds of decency, and are utterly intolerable in a civilized

community.

308.     The Individual Defendants knew or should have known that emotional distress was the

likely result of their conduct.

309.     The above-described actions on the part of the Individual Defendants were the cause of

an emotional distress suffered by the Plaintiff that was severe and of a nature that no

reasonable person could be expected to endure it.

310.     As a direct and proximate result of these acts and omissions the Plaintiff has suffered and

continues to suffer the harms and damages described above.


## ELEVENTH CAUSE OF ACTION
## <u>TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONS</u>

311.     The Plaintiff hereby incorporates and adopts each and every allegation in the preceding

paragraphs of this Verified Complaint.

312.     Under Massachusetts law, a person may not intentionally interfere with the advantageous

business relationship of another.

313.     The Individual Defendants were aware of the existence of a business relationship which

contemplated economic benefit to the Plaintiff and intentionally interfered with that business

relationship for an improper purpose and/or by improper means thereby causing the Plaintiff damages.

314.    As a direct and proximate result of these acts and omissions the Plaintiff has suffered and continues to suffer the harms and damages described above.

**TWELFTH CAUSE OF ACTION**
**DECLARATORY JUDGMENT**

315.    The Plaintiff hereby incorporates and adopts each and every allegation in the preceding paragraphs of this Verified Complaint.

316.    The Defendants committed numerous violations of federal and state law, as well as of the contracts between them.

317.    The Plaintiff's education and future career have been severely damaged.  Without appropriate redress, the unfair outcome of the Defendants' investigation will cause irreversible damages to the Plaintiff's educational career and employment prospects, certainly for years and perhaps for decades.

318.    As a result of the foregoing, there exists a justiciable controversy between the parties with respect to the outcome, permanency, and future handling of the Plaintiff's formal student record at WNEU.

319.    By reason of the foregoing, the Plaintiff requests, pursuant to 28 U.S.C. § 2201, a declaration that:  (i) the outcome and findings made by the Defendants' investigation be reversed; (ii) the Plaintiff's reputation be restored; (iii) the Plaintiff's disciplinary record be expunged; (iv) the Defendants' September 24, 2015 report be destroyed; and (v) that Defendant WNEU's policies and procedures regarding allegations of sexual misconduct are contrary to law and therefore illegal.

## PRAYER FOR RELIEF

WHEREFORE, John Doe as Plaintiff herein respectfully requests that this Court enter judgment against the Defendants jointly and severally on all counts of this Verified Complaint. The Plaintiff further requests that this Court:

1. Issue a preliminary and permanent injunction enjoining the Defendants, Defendants' agents, employees, and all persons in active concert or participation with them, from violating the Plaintiff's rights by commencing with the aforementioned disciplinary hearing seeking to dismiss or suspend him from the Defendant University;

2. Retain jurisdiction of this matter for the purpose of enforcing this Court's order'

3. Allow the declaratory judgment as herein requested;

4. Order the Defendants to reverse their finding that the Plaintiff violated the Defendant University's policies and expunge his record;

5. Award the Plaintiff compensatory damages in an amount to be determined at trial;

6. Award the Plaintiff the reasonable costs of this action, including attorneys' fees, expenses, costs, and disbursements; and

7.  Grant such other and further relief as this Court deems equitable and just.

## PLAINTIFF DEMANDS A TRIAL BY JURY

FOR THE PLAINTIFF
BY HIS ATTORNEYS,


/s/ Stephen E. Spelman
_____
Stephen E. Spelman, Esq. – BBO# 632089
EGAN, FLANAGAN AND COHEN, P.C.
67 Market Street - P.O. Box 9035
Springfield, MA 01102-9035
(413) 737-0260; Fax: (413) 737-0121
ses@efclaw.com


## VERIFICATION

I declare and affirm, under the pains and penalties of perjury, that to the best of my

knowledge the allegations set forth above are true and correct.


/s/  John Doe
JOHN DOE

Dated:  11/2/15