UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15-cv-30192-MAP |
| | ) | |
| WESTERN NEW ENGLAND UNIVERSITY, | ) | |
| ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

REPORT AND RECOMMENDATION REGARDING DEFENDANTS' MOTION TO
DISMISS PLAINTIFF'S AMENDED COMPLAINT
(Dkt. No. 30)

ROBERTSON, U.S.M.J.

I.     INTRODUCTION

Plaintiff John Doe ("Plaintiff")[1] has sued Western New England University ("WNEU" or

"University") and eight university employees (collectively "Defendants") regarding WNEU's

two-year suspension of Plaintiff in November 2015 for alleged sexual misconduct.  In his first

amended verified complaint ("Complaint") (Dkt. No. 22), Plaintiff asserts the following causes

of action against the University:  breach of contract (Count I); breach of the implied covenant of

good faith and fair dealing (Count II); estoppel and reliance (Count III); breach of the common

law duty of basic fairness (Count V); and a violation of Title IX (Count XI).  Plaintiff brings a

claim against all Defendants for the intentional infliction of emotional distress ("IIED") (Count

VII).  Plaintiff also seeks a declaratory judgment against the University under 28 U.S.C. § 2201

(Count XIII).

---

[1] The parties have agreed that Plaintiff will proceed under a pseudonym (Dkt. No. 9).

Now before the court is Defendants' motion to dismiss all contested counts (Dkt. No. 30),[2] which was referred to the undersigned for report and recommendation (Dkt. No. 43). *See* Fed. R. Civ. P. 72; 28 U.S.C. §636(b)(1)(b). The court heard argument from the parties on May 19, 2016. For the reasons stated below, the court recommends that the Defendants' motion to dismiss be allowed as to Counts III (estoppel and reliance), IV (unjust enrichment), V (breach of the common law duty of basic fairness), VI (negligence), VII (IIED), VIII (tortious interference with advantageous business relations), IX (violations of the Clery Act and regulations), X (violation of FERPA), and XI (violation of Title IX), and denied, in part, as to Counts I (breach of contract), II (breach of the covenant of good faith and fair dealing), and XIII (declaratory judgment).

II.    STANDARD OF REVIEW

Defendants move to dismiss the Complaint under Fed. R. Civ. P. 12(b)(6) (Dkt. No. 30). "Motions to dismiss under Rule 12(b)(6) . . . test the sufficiency of the pleadings." *Hagenah v. Cmty. Enter., Inc.*, Case No. 15-cv-30036-KAR, 2016 WL 1170963, at *3 (D. Mass. Mar. 23, 2016). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim [for] relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

---

[2] Plaintiff failed to oppose Defendants' contention that the following claims should be dismissed: unjust enrichment (Count IV); negligence (Count VI); tortious interference with advantageous business relations (Count VIII); a violation of the Clery Act and its regulations (Count IX); and a violation of FERPA (Count X) (Dkt. No. 36). Plaintiff's failure to respond to Defendants' request for dismissal of these claims constitutes a waiver. *See Vallejo v. Santini–Padilla,* 607 F.3d 1, 7 n.4 (1st Cir. 2010) ("[p]laintiffs have not cited a single authority in support of their assertion that their failure to timely oppose the motion to dismiss did not constitute waiver" and noting that "[p]laintiffs did not properly raise their arguments below"). *See also Edsall v. Assumption Coll.*, 367 F. Supp. 2d 72, 78 (D. Mass. 2005) (dismissing a count because plaintiffs did not object to defendants' motion to dismiss). Plaintiff's amended complaint omits a Count XII (Dkt. No. 22).

"Plausibility does not demand a showing that the claim is likely to succeed.  It does, however, demand a showing of 'more than a sheer possibility' of success."  *Butler v. Balolia*, 736 F.3d 609, 616 (1st Cir. 2013) (quoting *Iqbal,* 556 U.S. at 678).  In order to meet the plausibility standard, "[t]he plaintiff must proffer more than mere 'labels and conclusions' or 'naked assertions devoid of further factual enhancement.'"  *Garrity, Levin & Muir, L.L.P. v. United States*, No. CV 15-11405-RGS, 2015 WL 6126816, at *2 (D. Mass. Oct. 16, 2015) (quoting *Iqbal*, 556 U.S. at 678).

> The First Circuit has instructed that "[t]he plausibility inquiry necessitates a two-step pavane."  The court must first differentiate between "the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)."  Next, "the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'"  Moreover, the First Circuit has "emphasize[d] that the complaint must be read as a whole" and thus "[t]here need not be a one-to-one relationship between any single allegation and a necessary element of the cause of action."

*Doe v. Brown Univ.*, C.A. No. 15-144 S, 2016 WL 715794, at *4 (D.R.I. Feb. 22, 2016) (quoting *Garcia-Catalan v. United States*, 734 F.3d 100, 103 (1st Cir. 2013)).

III.    R̲ELEVANT F̲ACTUAL AND P̲ROCEDURAL B̲ACKGROUND

In deciding Defendants' motion to dismiss, the court must determine whether the facts that are alleged in Plaintiff's Complaint and in documents that were submitted as exhibits to his original complaint, which are incorporated by reference into the Complaint, clear the plausibility hurdle (Dkt. Nos. 1, 22).[3]  *See Iqbal*, 556 U.S. at 679.  The court also considers facts drawn from

---

[3]  The documents incorporated by reference into the Complaint are:  a letter from Plaintiff's counsel to the University's general counsel dated July 6, 2015 (Dkt. No. 1-1); the University's 2015-2016 Student Handbook (Dkt. No. 1-2); the University's 2014-2015 Student Handbook (Dkt. No. 1-3); minutes of a meeting on July 10, 2015, which was attended by Plaintiff, his parents, his counsel, Defendant Donna-Rae Kenneally and Defendant Beth A. Hill (Dkt. No. 1-4); and the University's Discrimination/Harassment/Sexual Misconduct/Title IX Policy and Procedures (Dkt. No. 1-6).  *See Trans-Spec Truck Serv. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008) ("Exhibits attached to the complaint are properly considered part of the pleading 'for all purposes,' including rule 12(b)(6)") (quoting Fed. R. Civ. P. 10(c)).

documents whose authenticity is "not disputed by the parties" and documents that are "sufficiently referred to" in Plaintiff's Complaint. *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).[4] "Because this is a motion to dismiss and the [c]ourt must 'assume the truth of the well-pleaded facts and indulge all reasonable inferences therefrom,'" the facts are construed in the light most favorable to Plaintiff. *Brown Univ.*, 2016 WL 715794, at *2 n.3 (quoting *Arruda v. Sears, Roebuck & Co.*, 310 F.3d 13, 18 (1st Cir. 2002)).

    A.    <u>September 26-27, 2014:  The Sexual Encounter between Plaintiff and Loe</u>

    Plaintiff, who is a Maine resident, was a full-time student at the University in September 2014 (Dkt. No. 22 ¶41).[5]  According to Plaintiff, after he and a female student, Linda Loe ("Loe"),[6] attended a party on the University's campus on the evening of September 26, 2014, they eventually went to Plaintiff's dormitory room where they kissed, removed their clothes, and

---

[4] On a motion to dismiss, the court may properly take into account documents that are:  (1) of undisputed authenticity; (2) official public records; (3) central to plaintiff's claim; and (4) sufficiently referred to in the complaint. *See Doe v. Brandeis Univ.*, Civil Action No. 15-11557-FDS, 2016 WL 1274533, at *6 n.1 (D. Mass. Mar. 31, 2016) (citing *Watterson*, 987 F.2d at 3). Here, the court considers the following documents, which were submitted in support of Defendants' motion to dismiss (Dkt. No. 31):  the summary of the complainant's interview with Defendant Joanne Ollson on June 16, 2015 (Dkt. No. 22 ¶¶95-115; Dkt. No. 31-1); the notice to Plaintiff of the interview and investigation (Dkt. No. 31-2); the summary of the complainant's interview with Kenneally and Hill on July 14, 2015 (Dkt. No. 22 ¶¶138-151; Dkt. No. 31-5); the summary of the complainant's interview with Kenneally and Hill on September 1, 2015 (Dkt. No. 22 ¶¶165-170; Dkt. No. 31-6); e-mail messages of September 1, 2015 between Ollson and Hill (Dkt. No. 22 ¶¶182, 184; Dkt. No. 31-7); the notice to Plaintiff of the pre-hearing informational meeting (Dkt. No. 31-8); the notice to Plaintiff of the conduct review hearing (Dkt. No. 31-9); e-mail messages exchanged between Plaintiff's attorney and the University's general counsel in October 2015 (Dkt. No. 22 ¶¶218-221; Dkt. No. 31-10); the notice to Plaintiff of the decision and recommended sanction after the conduct review hearing (Dkt. No. 31-13); and Defendant Jeanne Harte-Steffes's response to Plaintiff's appeal (Dkt. No. 31-14).

[5] The University is a private institution that receives federal funds (Dkt. No. 22 ¶43).

[6] The parties identify the complainant by this pseudonym.

engaged in sexual touching and "consensual mutual and simultaneous oral sex" (*id*. at ¶¶20, 52).

Plaintiff sought Loe's consent to engage in sexual intercourse (*id.* at ¶20).  Plaintiff honored

Loe's stated "no" (*id.* at ¶¶20, 53).  They continued to engage in mutual oral sex until Loe

indicated that she wanted to stop (*id.*).  Plaintiff complied with her request (*id.*).  According to

Plaintiff, he asked Loe to "finish him off" so that he would not be left with "blue balls" (*id*. at

¶21).  She masturbated him to ejaculation (*id.*).  Loe, however, indicated that Plaintiff said, "Now

you have to finish me off," placed her hand on his penis, and held it there until he ejaculated

(*id.*).

After Loe dressed and left Plaintiff's room, she sent text messages to at least two friends

conveying details of her experience through words and positive "emojis"[7] (*id.* at ¶¶56, 58-60).

Other students, including Plaintiff's roommate, indicated that Loe did not display any unease

when she was in Plaintiff's presence after September 27, 2014 (*id.* at ¶61).

B.  Loe's Complaint against Plaintiff to the University's Title IX Officer and the
    University's Investigation

On June 16, 2015, Loe reported the September 26-27, 2014 incident to Defendant Joanne

Ollson, the University's Title IX officer (*id.* at ¶¶46, 95).  Loe told Ollson that her attendance at a

sexual assault prevention workshop in January 2015 precipitated her report (Dkt. No. 22 ¶112;

Dkt. No. 31-5 at 3; Dkt. No. 31-14 at 5).  In her first report about the encounter, Loe alleged that

after Plaintiff asked her questions that made her "'uncomfortable,'" he got on top of her, ripped

off her clothes, digitally penetrated her vagina, and forced her to fellate him and to submit to oral

sex, despite her repeated protests of "no" (Dkt. No. 22 ¶¶102-109; Dkt. No. 31-1 at 2-4).  Loe

---

[7] An "emoji" "is a pictograph included in a text message." *Enjaian v. Schlissel*, No. 14-CV-
13297, 2015 WL 3408805, at *6 n.9 (E.D. Mich. May 27, 2015).

told Ollson that, the following day, she sent text messages to her best friend about the incident (Dkt. No. 31-1 at 3).  She requested no contact with Plaintiff (*id.*).

On June 26, 2015, after Loe's report to Ollson, Defendants Donna Rae Kenneally and Beth A. Hill, the University's Title IX investigators, informed Plaintiff by letter that the University was investigating "an allegation that [he] may have engaged in acts of serious misconduct," including sexual misconduct (Dkt. No. 22 ¶64; Dkt. No. 31-2 at 2, 3).[8]  Plaintiff was notified that he "need[ed]" to meet with the University's investigators for an interview (Dkt. No. 31-2 at 2).  In addition, the letter supplied details of the process "to ensure that [it was] . . . transparent," and enclosed and referred Plaintiff to the University's "Title IX Discrimination Policy" ("Title IX Policy" or "Policy"), which was updated and implemented in November 2014, for the "applicable procedures," including his entitlement to an advisor in a limited role (Dkt. No. 1-6 at 2, 13; Dkt. No. 31-2 at 2-3).  Plaintiff was directed to consult the Student Code of Conduct in the 2014-2015 Student Handbook ("Handbook") for details of his "specific rights," and was advised to have no contact with Loe (Dkt. No. 22 ¶67; Dkt. No. 31-2 at 2-3).

Kenneally and Hill interviewed Plaintiff on July 10, 2015 in the presence of his counsel and the University's general counsel (Dkt. No. 22 ¶122).  At the outset of the meeting, Hill told Plaintiff that she was the University's Title IX investigator and that the investigation would be "'totally neutral'" (*id.* at ¶123).  When the investigators asked Plaintiff for his "'side of the story,'" his counsel intervened and asked that Plaintiff be advised of the allegation prior to speaking to the investigators (Dkt. No. 22 ¶¶124-127; Dkt. No. 31-4 at 2).  Plaintiff and his counsel reviewed Ollson's summary of her June 16, 2015 interview of Loe (Dkt. No. 22 ¶127; Dkt. No. 31-4 at 2).

---

[8] Kenneally was the University's Manager of Benefits Administration (Dkt. No. 22 ¶50).  Hill was the University's Senior Associate Director of Residence Life (*id.* at ¶48).

Plaintiff's counsel copied "the relevant portions of the document by hand" because the University did not provide Plaintiff with a copy of the interview summary (Dkt. No. 22 ¶¶130-131; Dkt. No. 31-4 at 2).

As Plaintiff's counsel copied the summary, Hill "began yelling at [Plaintiff], aggressively insisting that [Plaintiff] could not take any more time to review . . . Ollson's interview summary of Loe, and insisting that [Plaintiff] had to immediately start answering her questions" (Dkt. No. 22 ¶132). Plaintiff's counsel informed Hill that he would not permit her to "bully" Plaintiff and that her behavior indicated that she was not a "'neutral' investigator" (Dkt. No. 22 ¶133; Dkt. No. 31-4 at 2). After counsel conferred with Plaintiff, counsel informed the investigators that Plaintiff declined to be interviewed (Dkt. No. 22 ¶136; Dkt. No. 31-4 at 2). Counsel requested copies of relevant documents (Dkt. No. 22 ¶137; Dkt. No. 31-4 at 2).[9]

Loe was interviewed twice by Kenneally and Hill. During the first interview on July 14, 2015, Loe indicated that she did not object when Plaintiff kissed her (Dkt. No. 22 ¶138; Dkt. No. 31-5 at 2). She said she refused Plaintiff's request to remove her clothing, but she could not recall how or when her clothing was removed (Dkt. No. 22 ¶¶142, 143, 149; Dkt. No. 31-5 at 2-3). Her clothing was not torn (Dkt. No. 22 ¶148; Dkt. No. 31-5 at 3). When Plaintiff asked Loe to have sexual intercourse, she said, "no," and he honored her communication; that is, they did not have penile/vaginal intercourse (Dkt. No. 22 ¶¶144, 145; Dkt. No. 31-5 at 2-3). According to

---

[9] On September 1, 2015, Hill sent an e-mail message to Ollson, which summarized Loe's requests for no contact with Plaintiff, and indicated that Hill wanted to "reach out to [Plaintiff] and offer any opportunities in which he would feel more comfortable on campus" (Dkt. No. 22 ¶182; Dkt. No. 31-7 at 2). Hill sought Ollson's guidance on the appropriate way to communicate with Plaintiff since his attorney asked that all contact with Plaintiff be made through him (Dkt. No. 31-7 at 2). Ollson responded that she "believ[ed] that [Plaintiff] should be the one to request [no contact] measures as [Loe] has" (Dkt. No. 22 ¶184; Dkt. No. 31-7 at 2).

Loe, Plaintiff performed cunnilingus while his penis was in her mouth (Dkt. No. 22 ¶155; Dkt. No. 31-5 at 3). When Loe told Plaintiff to "stop," he complied with her request, and told her that she had "'to finish [him] off'" (Dkt. No. 22 ¶¶157, 158; Dkt. No. 31-5 at 3). He "put [Loe's] hand on his penis and ejaculated" (Dkt. No. 22 ¶158; Dkt. No. 31-5 at 3).

Kenneally and Hill's second interview with Loe was on September 1, 2015, after their interviews of "multiple witnesses" (Dkt. No. 22 ¶¶163, 165; Dkt. No. 31-6 at 2). Loe indicated that although she had consumed about three drinks at the party, she was not incapacitated (Dkt. No. 22 ¶166; Dkt. No. 31-6 at 2). This time, Loe said that after she and Plaintiff performed mutual oral sex for less than a minute, Loe said, "no" (Dkt. No. 31-6 at 2). Plaintiff said, "'[F]ine, you have to finish me off'" (Dkt. No. 31-6 at 2). Loe was not sure whether Plaintiff ejaculated in her hand or on the bed (Dkt. No. 22 ¶167; Dkt. No. 31-6 at 2). Loe told the investigators that her pants were torn at the seam (Dkt. No. 22 ¶168; Dkt. No. 31-6 at 2).

C.     The Pre-hearing Informational Meeting

With counsel, Plaintiff attended a pre-hearing informational meeting on October 14, 2015 in the office of Defendant Kymberly Hendricks, the University's Assistant Director of Residence Life for Programming and Graduate Housing (Dkt. No. 22 ¶¶51, 189). The University's general counsel also attended the meeting (*id*. at ¶189). Hendricks told Plaintiff, "'It's the University versus the student'" (*id.* at ¶¶198, 199). The University's general counsel repeatedly informed Plaintiff that he "was in the predicament he was in because [he] had 'failed to come forward' to provide his own statement about what had happened" (*id*. at ¶194).

Hendricks presented Plaintiff with a document entitled "Pre-hearing Informational Meeting, Cases involving Consideration of Suspension or Dismissal from [WNEU]" (Dkt. No. 22 ¶190; Dkt. No. 31-8 at 2-3). This document described the Alleged Misconduct that would be

the subject of the hearing as violations of the 2014-2015 Handbook's "Student Code of Conduct,

Article III-A:  Offenses Against Another Person(s)," and "Sexual Harassment and Sexual

Misconduct Policy" (Dkt. No. 1-3 at 37, 54; Dkt. No. 22 ¶191; Dkt. No. 31-8 at 2).  The form

also explained the possible sanctions for the alleged misconduct, including dismissal and

suspension, the format of the "judicial hearing," as well as the procedures that would be

employed at the hearing (Dkt. No. 31-8 at 2-3).

      The form notified Plaintiff of his obligations to provide a list of witnesses to Hill by a

certain date and to present a written statement to the hearing board, and stated that it was

Plaintiff's responsibility to ensure that his witnesses attended the hearing on time (Dkt. No. 31-8

at 3).  Plaintiff was referred to specific articles within Sections III and IV of the Student Conduct

Code in the Handbook for additional details (*id.*).  By his signature, Plaintiff confirmed that he

received a copy of the form as well as copies of the witness list and advisor forms that he was

required to return (*id.*).[10]  Plaintiff and his counsel were provided access to the University's

investigative file, which they were not given time to review in its entirety (Dkt. No. 22 ¶¶195,

203-204, 216-217).[11]

    D.    The Conduct Review Hearing and Plaintiff's Suspension

---

[10] The form stated:  "I am aware that I may seek assistance from an advisor of my choice.  I
understand that my advisor may attend my hearing, but may not speak for me."  Plaintiff was
required to provide the advisor's name to Hill (Dkt. No. 31-8 at 2-3).

[11] Plaintiff and his counsel were offered the opportunity to view documents and the contents of a
thumb drive on a computer in Hendricks's office (Dkt. No. 22 ¶210).  Plaintiff understood that
the thumb drive contained Loe's text messages as well as "hundreds of photos and audio
messages" (Dkt. No. 22 ¶209).  Plaintiff and his counsel did not have time to view the contents
of the thumb drive because they used the allotted hours to hand-copy hundreds of paper
documents in the investigative file (Dkt. No. 22 ¶¶94, 211, 217).  As a result, Plaintiff did not
hear "hundreds of audio messages" and did not see "hundreds of photographs" that the
University obtained from Loe's cell phone (Dkt. No. 22 ¶¶214, 215).

On October 26, 2015, Hill notified Plaintiff that Defendants Sean Burke and Adina Elfant, Ph.D., the Conduct Review Board ("CRB"), would hold the hearing on November 3, 2015 (Dkt. No. 22 ¶218; Dkt. No. 31-9 at 2).[12]  The letter repeated the two alleged violations of the Student Code of Conduct with which Plaintiff was charged:  the Student Code of Conduct, Article III-A:  Offenses Against Another Person(s); and the Sexual Harassment and Sexual Misconduct Policy (Dkt. No. 31-9 at 2).  A list of witnesses and advisors for the University, Loe, and Plaintiff was attached to the letter (*id.*).[13]  Hill advised Plaintiff that it was his responsibility to contact his advisor and witnesses and to ensure their timely appearance (Dkt. No. 22 ¶218; Dkt. No. 31-9 at 2).

Plaintiff submitted a written statement at the conduct review hearing and orally presented his version of events (Dkt. No. 22 ¶22; Dkt. No. 31-13 at 2).  The CRB "repeatedly refused" to pose Plaintiff's proposed questions to witnesses, while they asked most of Loe's proposed questions (Dkt. No. 22 ¶¶249, 250, 251).  In addition, the hearing officers permitted Loe to "make lengthy self-laudatory statements" (*id*. at ¶253).

On November 6, 2015, the CRB issued a sanction letter notifying Plaintiff of a two year suspension from the University (Dkt. No. 22 ¶255; Dkt. No.  31-13).  The letter referenced the two standards within the Student Code of Conduct that Plaintiff was alleged to have violated; that is, "Article III-A:  Offenses Against Another Person(s)" and the "Sexual Harassment and Sexual Misconduct Policy," and continued by finding that, more likely than not, Plaintiff

---

[12] Burke was the University's Associate Director of Residence Life and Deputy Title IX officer (Dkt. No. 22 ¶49).  Elfant was the University's Assistant Dean for Experiential Learning and Career Development (*id.* at ¶47).

[13] The list was not provided to the court.

violated "both of the standards of the Student Code of Conduct under which [he] was charged" (Dkt. No. 31-13 at 2). This conclusion was "[b]ased on written statements provided . . . as well as the verbal statements of those who participated in the hearing" (*id.*). The hearing officers made the following factual findings: that Plaintiff and Loe consented to kissing; that Plaintiff and Loe "engaged in other physical activity of a sexual nature;" that Loe did not want to have sexual intercourse and that they did not engage in penile/vaginal intercourse; and that both Plaintiff and Loe acknowledged that Loe's hand was on Plaintiff's penis and she "'finished [him] off'" (*id.*).

The CRB relied on two portions of the University's Title IX Policy, as follows, as a basis for their decision that Plaintiff had violated the Student Code of Conduct:

> The masturbation occurred after it was determined that there would not be penile/vaginal intercourse. According to statements from both [Plaintiff] and Loe, Loe said "no" to intercourse and [Plaintiff was] aware that she said no to intercourse. Loe's statement indicates that [Plaintiff] said, "now you have to finish me off" while [Plaintiff] claim[s] [he] asked her "Could you at least finish me off? Don't leave me with blue balls." According to University Title IX Policy (p.3) Prohibited Conduct: Sexual Misconduct http://www1.wne.edu/assets/45/TitleIXDiscrimination7.15.pdf *"Coercing someone into sexual activity violates this policy in the same way as physically forcing someone into sex. Coercion occurs when someone is pressured for sex."* According to the statements provided, we found Loe's statement to be more plausible and therefore determined that it is more likely than not that Loe's masturbation of [Plaintiff] was a coerced act.
>
> According to University Title IX Policy (p.3) – Prohibited Conduct: Sexual Misconduct http://www1.wne.edu/assets/45/TitleIXDiscrimination7.15.pdf *"Anything but a clear, knowing and voluntary consent to any sexual activity is equivalent to a "no."* Loe stated, and [Plaintiff] acknowledged, that she said "no" to sexual intercourse. Loe further stated that she said "no" to other sexual activity. Loe stated that "[Plaintiff] held my hand with his hand on his penis until he ejaculated. He made me feel I had no choice by forcing me to finish." At the hearing [Plaintiff] claimed that this sexual encounter was consensual. Based on these statements, we believe that it is more likely than not that Loe did not clearly and voluntarily consent to the masturbation and that it was a non-consensual and coerced act.

(Dkt. No. 22 ¶¶258, 260; Dkt. No. 31-13 at 2-3) (italics original).[14]

The CRB indicated that the two year suspension was "effective immediately" and that Plaintiff could return to the University for the Fall 2017 semester as long as he completed "an educational training on sexual misconduct" and provided proof of the training to the University (Dkt. No. 31-13 at 3). Plaintiff was notified that Article VII-B of the Student Code of Conduct provided that "[s]uspension is noted in the student's file and on the student's transcript during the term of suspension" and "[i]f suspension occurs during a semester in progress, University practice mandates that all courses become administrative withdrawals" (*id.*). Plaintiff was advised of his right to appeal to Defendant Jeanne Hart-Steffes, the Vice President for Student Affairs and Dean of Students, which he did (Dkt. No. 31-13 at 3; Dkt. No. 22 at ¶272).[15]

Hart-Steffes denied Plaintiff's appeal (Dkt. No. 22 ¶274; Dkt. No. 31-14 at 2). In response to Plaintiff's argument that he was found in violation of "'a policy that did not even exist,'" Hart-Steffes stated that the policy existed and cited:

> [p]age 182 of the 2014-2015 [WNEU] Student Handbook[, which] states, "Sexual misconduct refers to ANY (emphasis added) form of physical conduct or exploitation of

---

[14] The links accessed the University's "Discrimination/Harassment/Sexual Misconduct/Title IX Policy and Procedures," which were updated and implemented in November 2014 and revised as of July 15, 2015 (Dkt. No. 1-6; Dkt. No. 22 ¶¶260, 261).

[15] Regarding the review of conduct decisions by the Vice President for Student Affairs and Dean of Students, the 2015-2016 Handbook states, in relevant part:

> Respondents are not entitled to a re-hearing of the case. Respondents may seek one review only on the basis of the following:
>
> a.      a procedural error that unfairly and materially affected the outcome of the case;
> b.      the discovery of new information that could reasonably be expected to alter the decision and was not available at the time of the hearing; or
> c.      the sanction is inconsistent with the gravity of the offense.

(Dkt. No. 1-2 at 45).

> another person of a sexual nature that is made without effective consent."  Additionally the 2014-2015 Student Code of Conduct prohibits any act of coercion even if not spelled out explicitly. . . The University also has the obligation to revise its policies to be in compliance with local state and federal mandates.  As such, the University distributed its sexual misconduct policy to the University community in late 2014.  The word "coercion" served as a clarification to the act of un-consented to sexual conduct pursuant to the University's obligation under Title IX.

(Dkt. No. 22 ¶277; Dkt. No. 31-14 at 2, 3).  She further advised that Plaintiff received "procedural protections" under the Title IX Policy, which were "more expansive" than the rights articulated in the 2014-2015 Student Code of Conduct (Dkt. No. 31-14 at 2).  For example, the Title IX Policy permitted an attorney to act as an advisor, but the Student Code of Conduct did not (*id*.).

Hart-Steffes rejected Plaintiff's twelve other claimed errors in the hearing process, which included alleged denials of access to information prior to the hearing, complaints about Plaintiff's witnesses' absence, and imposition of an unfair sanction (Dkt. No. 22 ¶273; Dkt. No. 31-14 at 3-5).  She found that the hearing officers "followed [the University's] process and procedures exactly as they should" and that the two-year suspension was fair and reasonable (Dkt. No. 31-14 at 5).  Hart-Steffes, however, put Plaintiff's Fall 2015 suspension in abeyance, permitted Plaintiff to complete his courses as an "on-line student" where possible, and allowed him to take his final examinations on campus "[w]ith special permission" (Dkt. No. 31-14 at 5-6).

  E.  <u>Procedural History in this Court</u>

Plaintiff filed his original complaint against Defendants on November 2, 2015 (Dkt. No. 1).  After a hearing, the district court denied Plaintiff's motions for a temporary restraining order and preliminary injunction on November 3, 2015 (Dkt. Nos. 5, 7, 20).  Plaintiff filed the Complaint on November 23, 2015 (Dkt. Nos. 22, 23).  Defendants moved to dismiss (Dkt. No. 30).  Defendants' motion was referred to this court on March 9, 2016 (Dkt. No. 43).

IV.   DISCUSSION

A.   Breach of Contract (Count I)

The parties agree that Massachusetts law applies in this case, and that under state law, the relationship between a student and a university is based on contract (Dkt. No. 22 ¶70; Dkt. No. 33 at 2 n.3; Dkt. No. 36 at 7).[16]  *See Cloud v. Trs. of Boston Univ.*, 720 F.2d 721, 724 (1st Cir. 1983).  "The terms of this contract were the terms contained in the Student Handbook and other college materials."  *Bleiler v. Coll. of the Holy Cross*, Civil Action No. 11-11541-DJC, 2013 WL 4714340, at *14 (D. Mass. Aug. 26, 2013), *appeal dismissed*, No. 13-2245 (1st Cir. Apr. 30, 2015).  *See Cloud*, 720 F.2d at 724.

Count I of the Complaint asserts that the University breached its contract with Plaintiff by (1) applying the Title IX Policy retroactively to the incident between Plaintiff and Loe; (2) failing to investigate; (3) violating Plaintiff's right to an effective advisor throughout the investigation and at the hearing; (4) failing to provide Plaintiff with copies of the records to which he was entitled; (5) failing to secure the presence of witnesses favorable to Plaintiff at the hearing; and (6) violating its obligations to presume Plaintiff innocent, to bear the burden of proof and the burden of production of evidence at the hearing, and to apply the correct standard of proof (Dkt. No. 22 ¶286).

Due to the time that elapsed between the alleged sexual contact and WNEU's investigation and formal disciplinary proceedings, the contract terms are contained in three documents:  the 2014-2015 and 2015-2016 Handbooks, which included the Student Code of

---

[16] "To prevail on a claim for breach of contract [in Massachusetts], a plaintiff must demonstrate that there was an agreement between the parties; the agreement was supported by consideration; the plaintiff was ready, willing, and able to perform his or her part of the contract; the defendant committed a breach of the contract; and the plaintiff suffered harm as a result."  *Bulwer v. Mount Auburn Hosp.*, 46 N.E.3d 24, 39 (Mass. 2016).

Conduct, and descriptions of the student judicial system and the judicial process (Dkt. No. 1-2 at 3-4 [2015-2016 Handbook]; Dkt. No. 1-3 [2014-2015 Handbook] at 4-5); and the Title IX Policy, which contained standards of conduct and the complaint resolution procedure (Dkt. No. 1-6).  The parties agree that the 2014-2015 Handbook's provisions applied to Plaintiff's alleged sexual misconduct in September 2014, and to the investigation in June and July 2015 (Dkt. No. 22 ¶¶263, 264, 270; Dkt. No. 33 at 2 n.3, 23-24).  *See Doe v. Brandeis Univ.*, Civil Action No. 15-11557-FDS, 2016 WL 1274533, at *14, *27 (D. Mass. Mar. 31, 2016) (hereinafter *Brandeis*) (university "applied the substantive policies (but not the procedures) for the academic year in which the conduct occurred"); *Coveney v. President & Trs. of the Coll. of the Holy Cross,* 445 N.E.2d 136, 140 (Mass. 1983) (applying the terms of the student handbook in effect at the time of the incident and student's expulsion).  Defendants do not dispute that the Title IX Policy was "updated and implemented in November 2014" and amended in July 2015 (Dkt. No. 33 at 23-24), which made it applicable to the investigation in June and July 2015 and to the formal disciplinary process, which commenced in October 2015 (Dkt. No. 1-6 at 2, 13; Dkt. No. 22 ¶261).  *See Brandeis*, 2016 WL 1274533, at *11 (university properly applied the procedures in affect at the time of the investigation and disciplinary decision).  In addition, the 2015-2016 Handbook's procedures also applied to the formal disciplinary process.  *See id.*[17]

     "When interpreting contracts between students and their academic institutions, under Massachusetts law courts 'employ "the standard of reasonable expectation – what meaning the party making the manifestation, the university, should reasonably expect the [student] to give it."'"  *Bleiler*, 2013 WL 4714340, at *15.  *See also Havlik v. Johnson & Wales Univ.*, 509 F.3d

---

[17] The "Judicial Process" sections of the 2015-2016 Handbook are substantially similar to the analogous portions of the 2014-2015 Handbook.  *Compare* Dkt. No. 1-2 at 42-46 *with* Dkt. No. 1-3 at 44-47.

25, 34-35 (1st Cir. 2007); *Cloud*, 720 F.2d at 724; *Schaer v. Brandeis Univ.*, 735 N.E.2d 373, 378 (Mass. 2000). "Contract interpretation, including whether any ambiguities exist in the disputed contractual terms, is generally a question of law for the [c]ourt." *Bleiler*, 2013 WL 4714340, at *15 (citing *Driscoll v. Bd. of Trs. of Milton Acad.*, 873 N.E.2d 1177, 1185-86 (Mass. App. Ct. 2007)). "Where, as here, the university specifically provides for a disciplinary hearing . . . [the court] review[s] the procedures followed to ensure that they fall within the range of reasonable expectations of one reading the relevant rules." *Cloud,* 720 F.2d at 724–25. As is the case with interpretation of the Handbook provisions, "an objective reasonableness standard" applies. *Walker v. President & Fellows of Harvard Coll.*, 82 F. Supp. 3d 524, 530 (D. Mass. 2014) (quoting *Cloud*, 720 F.2d at 724-25).

Plaintiff recites a litany of complaints about the process, each of which is addressed below. In the court's view, only two of these state actionable breach of contract claims.

      1.      The University Breached the Contract by Retroactively Applying the Title IX Policy to Plaintiff's Conduct.

The sexual encounter between Plaintiff and Loe occurred on September 26-27, 2014, more than six weeks before the University implemented the Title IX Policy that it relied on to conclude that Plaintiff had engaged in sexual misconduct (Dkt. No. 1-6 at 13; Dkt. No. 22 ¶3). After Loe's complaint to the Title IX officer in June 2015, the University notified Plaintiff that he allegedly violated two Student Code of Conduct provisions contained in the 2014-2015 Handbook (Dkt. No. 1-3 at 37, 54; Dkt. No. 31-8 at 2-3). In determining that Plaintiff was responsible for violating the University's sexual misconduct policy, however, the CRB applied the University's Title IX Policy's descriptions of sexual misconduct implemented after the sexual contact at issue (Dkt. No. 22 ¶¶258, 260; Dkt. No. 31-13 at 2-3). Plaintiff's assertion that the University violated its agreement with him encompasses two related claims: (1) he did not

receive notice of the prohibited conduct for which he was ultimately found responsible; and (2)

prior to the hearing, he did not have notice of the policy that he was alleged to have violated

(Dkt. No.  22 ¶286).  Because the court is not persuaded by the University's argument that the

Title IX Policy merely filled a "definitional hole" in its prior sexual misconduct policy (Dkt. No.

33 at 24), the court finds that Plaintiff states a plausible claims for relief.

The pertinent segments of the 2014-2015 Handbook and the Title IX Policy are as

follows.

a.    Section III of the 2014-2015 Student Handbook, including
      description of Title IX

Section One articulates the following "Guiding Philosophy":

The goals of this Student Code of Conduct and the corresponding review processes are to
help students understand and accept their obligations as members of the community and
to advance the University's educational mission by defining and establishing certain
norms of behavior.  The rules and policy statements that follow serve to clarify
commonly accepted standards of conduct by members and prospective members of this
University community.

(Dkt. No. 1-3 at 35).[18]

 Section Two contains the Student Code of Conduct (Dkt. No. 1-3 at 35).  Article III of

the Student Code of Conduct describes "Specific Standards of Behavior" as follows:

Certain behaviors by any student, students, or student organizations can violate the
Student Code of Conduct.  Prohibited behaviors include, but are not limited to:

A.  Offenses Against Another Person(s), such as:

- Intentionally or recklessly threatening or causing another person emotional
  distress;

. . .

---

[18] The portion of the Handbook that discusses Residence Life says that the policies and
procedures "exist to inform students of both their rights and their responsibilities as students"
(Dkt. No. 1-3 at 18-19; Dkt. No. 22 ¶¶263, 270).

- Any actual or threatened non-consensual sexual act or misconduct.  Non-consensual presumes that the other person is able to make a reasonable judgment under the circumstances and is not impaired by intoxication, unconsciousness, or other incapacity.  If the other person is impaired, a student may not guess, assume, or infer consent. . . .

(Dkt. No. 1-3 at 37).

F.  Responsibility for Standards of Behavior

Students are also responsible for all policies in Section III of this [H]andbook entitled "Standards of Behavior and Student Accountability," specifically:

- Student Code of Conduct

. . .

- Sexual Harassment and Sexual Misconduct Policy

- Additional Standards and Policies (. . . Title IX).

(Dkt. No. 1-3 at 38).

The relevant portions of the Sexual Harassment and Sexual Misconduct Policy, which is contained in Section III of the 2014-2015 Handbook, states:

In Massachusetts, sexual harassment means unwelcome sexual advances, requests for sexual favors, and/or physical conduct of an unwelcome sexual nature, when:
. . .
- Such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment or, in the educational living/learning setting, the creation of [a] similarly hostile, humiliating, or sexually offensive academic or student residential environment.
. . .
Other sexually-oriented conduct that is unwelcome and has the effect of creating a workplace and/or learning environment that is hostile, offensive, intimidating, or humiliating to male or female members of the University community may also constitute sexual harassment.  While it is not possible to list all circumstances that may constitute sexual harassment, the following are some examples of conduct which, depending on each circumstance, may constitute sexual harassment:

- Unwelcome sexual advances, whether they involve physical contact or not;
. . .
Sexual misconduct refers to any form of physical contact or exploitation of another person of a sexual nature that is made without effective consent.  Effective consent means

18

that a person is able to make free, informed, and reasonable choices and decisions – and is not impaired by intoxication or other drug consumption (be it voluntary or otherwise), by disability, or by fear.  Sexual behavior without effective consent can lead to sexual misconduct, sexual assault, and/or sexual harassment.  **Consent is effective when it has been clearly communicated.  Consent may never occur if a person is unconscious, unaware, or otherwise physically helpless.**

(Dkt. No. 1-3 at 53-54) (emphasis original).

The last page of the 2014-2015 Handbook contains a single paragraph describing Title IX (Dkt. No. 1-3 at 61).  This section indicates that WNEU "does not discriminate on the basis of sex in its education programs; sexual harassment and sexual violence are types of sex discrimination that will not be tolerated at the University" (*id.*).  It also lists the Title IX officer, Ollson, and the two deputies, Burke and another (Dkt. No. 1-3 at 62).

                            b.        The Title IX Policy

The Title IX Policy, implemented on November 17, 2014, describes "Prohibited Conduct," including "Sexual Misconduct" and "Sexual Assault" (Dkt. No. 1-6 at 4-6, 13), as follows:

> Sexual Misconduct[:]  A violation of this policy may occur if one party engages in sexual activity with another party without consent.  In order for individuals to engage in sexual activity of any kind with each other, there must be clear knowing [sic] and voluntary consent prior to and during sexual activity.  Effective consent means that a person is able to make free, informed, and reasonable choices and decisions, and is not impaired by intoxication or other drug consumption (be it voluntarily or otherwise), by disability, or by fear.  Consent is effective when it has been clearly communicated.  Consent may never occur if a person is unconscious, unaware, or otherwise physically helpless.
>
> Anything but a clear, knowing and voluntary consent to any sexual activity is equivalent to a "no."
>
> *Coercing someone into sexual activity violates this policy in the same way as physically forcing someone into sex.  Coercion occurs when someone is pressured for sex.*
>
> In short, consent may include explicit communication and mutual approval of the sexual activities in which the parties are involved.  For consent, individuals involved in the sexual activity must willingly and knowingly engage in the activity.  As a result, consent cannot be given due to physical force, intimidating behavior, threats, or coercion.

> Engaging in sexual activity with someone through force, intimidation, threats, or coercion is a violation of this policy.  Further consent cannot be given by an individual who is incapacitated. . . . Sexual misconduct offenses include but are not limited to, sexual harassment, sexual assault, and sexual violence as defined below.

(Dkt. No. 1-6 at 4) (emphasis added).

> Sexual Assault:  The term "sexual assault" means any nonconsensual sexual act proscribed by Federal, tribal, or State law, including when the victim lacks capacity to consent.
>
> Sexual assault includes, but is not limited to:
>                                 . . .
> - Coercing, forcing, or attempting to coerce or force a person to touch another person's intimate parts without that person's consent.

(Dkt. No. 1-6 at 5-6).  The Title IX Policy continues by describing the University's reporting requirements, including the requirements for claims of sexual misconduct and the resulting investigation (Dkt. No. 1-6 at 7-8).  The Policy states that the procedures for the resolution of claims that are outlined in the Handbook's Student Code of Conduct in the Student Handbook apply to cases in which the respondent is a student, and provides a link to the 2014-2015 Handbook for a description of these procedures (Dkt. No. 1-6 at 8).

> c.      Notice of prohibited conduct.

The purpose of the Handbook's Student Code of Conduct in September 2014 was to "help students understand and accept their obligations as members of the community" (Dkt. No. 1-3 at 35).  The rules and policy statements were aimed at "clarify[ing] commonly accepted standards of conduct" (*id.*).  In other words, the Student Code of Conduct was the contract between the University and Plaintiff, which gave Plaintiff notice that the failure to comply with defined standards of conduct could lead to sanctions.

The question, therefore, is whether, under an objective standard, the University reasonably could expect a student in Plaintiff's position to understand that the 2014-2015

Handbook prohibited the conduct in which he engaged with Loe.  *See Cloud*, 720 F.2d at 724;

*Bleiler*, 2013 WL 4714340, at *15 (citing *Schaer*, 735 N.E.2d at 378).  In defining sexual

misconduct and consent, the 2014-2015 Handbook and the Title IX Policy draw nuanced

distinctions that may be difficult for a college student, not trained in the law, to understand and

apply.  Nonetheless, as a student at WNEU, Plaintiff agreed to abide by Defendant's student

Standards of Behavior, including the sexual harassment and sexual misconduct policy and the

Title IX Policy.  The Title IX policy in effect when Plaintiff and Loe had their sexual encounter

in September 2014 provided only that sexual harassment and sexual violence were forms of

sexual discrimination that would not be tolerated (Dkt. No. 1-3 at 61).  Thus, under the

agreement between Plaintiff and Defendant, Plaintiff's obligation, at the time of his sexual

encounter with Loe, was to comply with Defendant's sexual harassment and sexual misconduct

policy (Dkt. No. 1-3 at 37, 54).  That policy provided, insofar as relevant, that "sexual

misconduct" referred to any form of "physical conduct or exploitation of another person of a

sexual nature . . . made without effective consent" (Dkt. No. 1-3 at 54).  Consent had to be

clearly communicated (*id.*).

A finder of fact could conclude in this case that: (1) the CRB found, explicitly or

implicitly, that Loe consented to certain forms of sexual intimacy with Plaintiff and that he

complied when she said "no" to penile/vaginal intercourse and further oral sex; (2) the CRB did

not conclude that Loe said "no" when Plaintiff either asked or instructed her to "finish him off;"

and (3) the CRB found that Loe was not impaired and was in a condition to make free and

informed choices and that she clearly communicated consent to some forms of sexual intimacy

with Plaintiff (Dkt. No. 31-13 at 2-3).  The policy was ambiguous as to whether consent had to

be communicated orally or could be communicated by acts.  A factfinder could conclude that

Plaintiff could reasonably expect, under the terms of the sexual harassment and sexual misconduct policy in effect in September 2014, that Loe's consent remained operative and extended to further sexual activity when she did not say "no" or physically rebuff him.

Even if the CRB could reasonably conclude that Plaintiff's demand that Loe "finish him off" constituted pressuring her for sex in violation of Defendant's Title IX Policy, that policy was not in effect and was not part of the contract between Plaintiff and Defendant as of September 26-27, 2014.  A jury could conclude that the University could not reasonably expect a student who read the 2014-2015 Handbook's sexual misconduct policy to intuit that it included the Title IX Policy's more finely tuned definition of sexual misconduct.  *See Schaer*, 735 N.E.2d at 378.  At a minimum, the Handbook's standards regarding coercion are ambiguous, which results in its terms being construed against the University.  *See Brandeis*, 2016 WL 1274533, at *26 (citing cases); *Suffolk Constr. Co. v. Lanco Scaffolding Co.*, 716 N.E.2d 130, 133 (Mass. App. Ct. 1999) ("Contract language is ambiguous where 'an agreement's terms are inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken'") (quoting *Fashion House, Inc. v. K Mart Corp.,* 892 F.2d 1076, 1083 (1st Cir. 1989)).  Plaintiff has sufficiently pled that the University breached the contract by finding him responsible for behavior that was not included in the 2014-2015 Handbook's description of prohibited conduct.  For the foregoing reasons, the court concludes that Plaintiff's breach of contract claim should not be dismissed insofar as he alleges that he was disciplined for conduct that was not prohibited under existing policies.

        d.      Notice of the allegations of misconduct before the CRB.

Plaintiff further claims that he received insufficient notice of the allegations that he would have to prepare to meet at the hearing because he was not informed that the CRB would apply the Title IX Policy to him (Dkt. No. 22 ¶286).  The court agrees.

Section Four of Section III of the 2015-2016 Handbook, which applies to the disciplinary process here, outlined the "Judicial Process" (Dkt. No. 1-2 at 42-45).  Article III of Section Four describes the process to which a "respondent" -- a student allegedly in violation of the University's applicable policy or procedure -- was entitled in cases, such as this, which involved consideration of suspension or dismissal (Dkt. No. 1-2 at 38, 43-45).  Plaintiff was entitled to receive "a written statement identifying the section of the Student Code of Conduct that was allegedly violated and the possible sanction(s) that might apply" at the pre-hearing informational meeting (Dkt. No. 1-2 at 43).  The Handbook also required the University to provide "the specific charge(s) relating to the alleged misconduct" in the written notice of the conduct review hearing (*id.*).

The Pre-hearing Informational Meeting form notified Plaintiff that he was alleged to have violated the following two standards within the Student Code of Conduct:

- Student Code of Conduct, Article III-A:  Offenses Against Another Person(s), specifically intentionally or recklessly threatening or causing another person emotional distress; any actual or threatened non-consensual sexual act or misconduct; non-consensual presumes that the other person is able to make a reasonable judgment under the circumstances and causing physical and/or emotional harm to another person.

- Sexual Harassment and Sexual Misconduct Policy

(Dkt. No. 1-3 at 37, 54; Dkt. No. 22 ¶191; Dkt. No. 31-8 at 2).  The letter that notified him of the conduct review hearing and the CRB's post-hearing decision reiterated these descriptions of the two standards that he allegedly violated (Dkt. No. 31-9 at 2; Dkt. No. 31-13 at 2).

The CRB found that "it was more likely than not" that Plaintiff violated "both of the standards of the Student Code of Conduct under which [he was] charged" (Dkt. No. 31-13 at 2). The CRB's decision, however, was based on its findings that Plaintiff violated two sections of the Title IX Policy on Sexual Misconduct, which were not included in either the 2014-2015 Handbook or the notices provided to Plaintiff (Dkt. No. 1-3 at 37, 54; Dkt. No. 31-8 at 2; Dkt. No. 31-13 at 2). The University could not reasonably expect Plaintiff to understand that the descriptions of his alleged misconduct, which it provided to him prior to the hearing, included the Title IX Policy on sexual misconduct. *See Cloud*, 720 F.2d at 724. The lack of adequate notice of the charges suffices to state a claim for a breach of contract. *See Fellheimer v. Middlebury Coll.*, 869 F. Supp. 238, 246-47 (D. Vt. 1994) (holding that the college breached the contract contained in the student handbook because "[t]he undisputed facts show that [plaintiff] was never told what conduct, if proven by a preponderance of the evidence at the hearing, would violate the . . . portion of the [h]andbook" for which he was sanctioned).

In addition, the Complaint states adequate grounds for the claim that Plaintiff's hearing was unfair due to the lack of adequate notice. *See id.* Although a student's due process rights do not equate to those afforded to a criminal defendant, *see Schaer*, 735 N.E.2d at 381, adequate warning of the misconduct that could result in a student's discipline is a fundamental element of fairness in the proceeding. *See Brandeis*, 2016 WL 1274533 at *33-34 (denying motion to dismiss for breach of contract and holding that university's failure to provide plaintiff with notice of the specific charges "may have substantially impaired the fairness of the proceeding"). Sufficient notice of the alleged misconduct is necessary to the preparation of a defense. *See Fellheimer*, 869 F. Supp. at 246-47. Here, Plaintiff presented his version of events to the CRB with the understanding that he was alleged to have violated standards of conduct in the 2014-

2015 Handbook (Dkt. No. 22 ¶22; Dkt. No. 31-13 at 2).  The CRB unfairly applied the Title IX

Policy's definition of misconduct.  *See Cloud*, 720 F.2d at 725; *Coveney*, 445 N.E.2d at 138-39.

Accepting the allegations in Plaintiff's complaint as true, Plaintiff has alleged sufficient facts to

support a finding that the University breached the contract by failing to notify Plaintiff of the

misconduct for which he was disciplined.  Plaintiff's remaining claims of breach of contract,

discussed below, are not legally sufficient to state breach of contract claims.

> 2.      The University conducted an investigation.

Despite Plaintiff's statement that "Defendants undertook an investigation," Plaintiff

alleges that the University was in breach of the contract by failing to adequately investigate Loe's

complaint (Dkt. No. 22 ¶¶11, 286).  The Handbooks and the Title IX Policy required the

University to investigate a complaint of sexual misconduct (Dkt. No. 1-2 at 42; Dkt. No. 1-3 at

44; Dkt. No. 1-6 at 8).  According to the Title IX Policy, "[p]rior to any hearings, the investigator

will interview all parties and witnesses, compile statements, verify statements, gather

documentation, review evidence, conduct research and draft a report to submit to the [CRB] . . .

if one has been convened" (Dkt. No. 1-6 at 8).  Details of Defendants' investigation, which

included these items, are alleged in Plaintiff's Complaint (Dkt. No. 22 ¶¶13, 59-61, 121, 138-155,

163, 165-171, 214, 215).  As a result, the Complaint fails to state a claim for breach of contract

for failure to investigate.  *See Iqbal*, 556 U.S. at 678.

> 3.      The University did not deny Plaintiff effective access to his attorney who
>         acted as his advisor.

Plaintiff further alleges that the University deprived him of his right to "an effective

advisor" in breach of the Handbooks' provision (Dkt. No. 22 ¶286).  The 2014-2015 and 2015-

2016 Handbooks permitted a student, such as Plaintiff, to "seek assistance from an advisor of the

student's choice, provided that the advisor is a member of the University community (current

student, faculty member, or staff member) and is not legal counsel acting in this capacity" (Dkt. No. 1-2 at 44; Dkt. No. 1-3 at 45).  "Parents, legal guardians, and/or legal counsel, regardless of their affiliation with complainants, respondents, and/or witnesses, are not permitted to attend any part of the process, pre-hearing or hearing" (Dkt. No. 1-2 at 44; Dkt. No. 1-3 at 46).  Under the Title IX Policy, in cases other than those in which a student was the respondent, an attorney was allowed to act as the respondent's advisor (Dkt. No. 1-6 at 8, 9).  The attorney was not permitted to act "as legal counsel or advocate," but could "observe and consult freely" with the respondent (Dkt. No. 1-6 at 9).  Although Plaintiff, a student-respondent, was not entitled to an attorney as an advisor under the terms of the Handbooks and Title IX Policy, Plaintiff's Complaint alleges that his legal counsel was present in the capacity of advisor at every stage of the process (Dkt. No. 22 ¶¶116-120, 122, 189, 204, 234, 248).[19]  By permitting Plaintiff's counsel to act as his advisor, Defendants allowed Plaintiff assistance during the disciplinary process to which he was not entitled.  Plaintiff fails to state a claim for relief on this ground.

      4.       Plaintiff was not denied access to investigative materials.

Plaintiff contends that provisions of the Family Educational Rights and Privacy Act (FERPA) incorporated in the Handbooks, along with separate provisions of the Handbooks,

---

[19] Plaintiff contends that he was deprived of an effective advisor because "he and his counsel were unable to privately confer while reviewing the [investigatory] materials" in the presence of the University's general counsel and that "[t]his restriction alone resulted in the hearing being one-sided and biased against [Plaintiff]" (Dkt. No. 36 at 9).  Plaintiff does not cite language from the Handbook that provided for his private access to records, and he fails to point to evidence that WNEU interfered with his right to privately consult with his counsel in other locations.

entitled him to receive copies of all of the records that were compiled during the investigation (Dkt. No. 22 ¶¶12, 208, 340, 341, 349).[20]

The section of the 2014-2015 Handbook that discusses "Student Records and Confidentiality," states that the University "adheres to a policy of compliance with . . . . FERPA" (Dkt. No. 1-3 at 29).  *See* 20 U.S.C. § 1232g.  FERPA "permits students to inspect their educational records" within 45 days of the student's written request (Dkt. No. 1-3 at 29, 30).[21] *See* 20 U.S.C. §1232g(a)(1)(A), (d) (right to "inspect and review" education records").[22] "Educational records include those records that contain information directly related to a student and are maintained as official files by the University" (Dkt. No. 1-3 at 29).  *See* 20 U.S.C. § 1232g(a)(4)(A).

In addition to the inspection and review of records that FERPA provided, the University permitted students to obtain copies of their records by paying reproduction costs (Dkt. No. 1-3 at 30).  However, "[t]he University reserve[d] the right to deny copies of transcripts or educational records . . . where there is an unresolved disciplinary action against the student" (*id.*).[23]

---

[20] FERPA does not provide either a private cause of action or rights that are enforceable under 42 U.S.C. § 1983.  *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 287-88 (2002); *Zona v. Clark Univ.*, 436 F. Supp. 2d 287, 290 (D. Mass. 2006).

[21] The 2015-2016 Handbook contains substantially similar provisions (Dkt. No. 1-3 at 28-30).

[22] Similar to FERPA, the Clery Act, 20 U.S.C. § 1092, requires that "the accuser, the accused, and appropriate officials" be provided "timely and equal access" to "any information that will be used during informal and formal disciplinary meetings and hearings."  34 C.F.R. § 668.46(k)(3)(i)(B)(3).

[23] Access to student records was also addressed in Article III of Section Four of Section III of the 2015-2016 Handbook, which explained the judicial process in cases involving consideration of suspension or dismissal from the University (Dkt. No. 1-2 at 43).  This section stated that respondents were entitled to a pre-hearing informational meeting during which "the report(s) about the alleged misconduct will be read and explained" (*id.*).  The student, however, was not

By letter of July 6, 2015, Plaintiff's attorney, on behalf of Plaintiff, requested copies of any records that were related to the investigation and disciplinary proceedings (Dkt. No. 1-1 at 3).  Plaintiff was not provided copies due to the "unresolved disciplinary action" (Dkt. No. 1-3 at 30; Dkt. No. 33 at 34).  He had access, however, to the investigatory materials in the University's possession, including Loe's statement to Ollson and the substance of witnesses' statements (*see, e.g.,* Dkt. No. 22 ¶¶59-61, 94-115, 121, 138-161, 210, 229-233).  His counsel took notes (*id.*). *Contrast Brandeis*, 2016 WL 1274533, at *29-30 (finding that the student's complaint stated a breach of contract claim upon which relief could be granted where the pleadings were unclear regarding whether the university provided the student access to a special examiner's report about his alleged sexual misconduct, as FERPA required); *Brown Univ.*, 2016 WL 715794, at *13 (finding plaintiff's allegation sufficient to state a claim for breach of contract where the handbook provided that "'the case administrator will respond' to the respondent's requests for information," and the university failed to comply); *Dempsey v. Bucknell Univ.*, Civil Action No. 4:11-cv-1679, 2012 WL 1569826, at *18-19 (M.D. Pa. May 3, 2012) (holding that plaintiff alleged sufficient facts to support a finding that the university breached the provision of the student handbook that promised "that Bucknell will provide the accused with a copy of the charges against him, along with supporting information, including the public safety department's report and witness statements").

Although Plaintiff had the opportunity to view certain photographs and text messages and to hear audio messages between Loe and other students, FERPA did not require the University to grant Plaintiff access (Dkt. No. 22 ¶¶209-210).  These were not Plaintiff's "educational records"

---

entitled to a copy (*id.*).  Plaintiff does not contend that the University breached its obligation to permit him to review a copy of the investigators' report.

28

because they did not "directly relate[]" to him.  20 U.S.C. § 1232g(a)(4)(A).  *See also* 20 U.S.C.

§ 1232g(a)(1)(A), (d) ("If any material or document in the education record of a student includes

information on more than one student, the [student] . . . shall have the right to inspect and review

only such part of such material or document as relates to such student or to be informed of the

specific information contained in such part of such material").

The case upon which Plaintiff relies, *United States v. Miami Univ.*, 294 F.3d 797 (6th Cir.

2002), does not require a different result (Dkt. No. 36 at 9).  Although *Miami Univ.* indicates that

"disciplinary records" are "educational records" under FERPA, Defendant does not dispute that

fact.  *Id.* at 812.  The case, however, does not support Plaintiff's contention that FERPA requires

a university to provide copies of such records, as opposed to access (Dkt. No. 36 at 9).  *Id.* at

812-15.

The allegations in Plaintiff's Complaint do not support a breach of contract claim based

on the University's duty to provide Plaintiff access to records.

> 5. The University did not have a duty to secure the presence of Plaintiff's
> witnesses at the hearing.

Plaintiff alleges that the University breached its "guarantee" that his favorable fact

witnesses would be allowed to testify at the hearing (Dkt. No. 22 ¶286).  Defendant counters that

no such promises were made by the Handbook or by the University's general counsel in her e-

mail exchanges with Plaintiff's counsel (Dkt. No. 33 at 17-18).  Defendant's argument is

persuasive.

The 2015-2016 Handbook explicitly gave Plaintiff notice that it was his responsibility to

provide "a list of witnesses . . . requested to attend [the] hearing" and that "a failure of one or

more of these person(s) to attend would not delay the hearing itself" (Dkt. No. 1-2 at 43).

Further, according to the Handbook:

> [t]he hearing board or administrative officer may refuse to hear any evidence that it deems irrelevant or unreliable.  The hearing board or administrative officer will determine what is reliable and relevant under the circumstances of the case.  Rules of evidence used in courts of law are not used in this process.

(Dkt. No. 1-2 at 44).  These admonitions were repeated in the Pre-hearing Informational Meeting form and in the letter that advised Plaintiff of the hearing date (Dkt. No. 13-8 at 3; Dkt. No. 13-9 at 2).  In view of the Handbook's terms, Plaintiff could not have reasonably expected the University to secure the attendance of his witnesses.

Plaintiff's assertion that the University's general counsel promised that his witnesses would be present verges on frivolous (Dkt. No. 22 ¶¶218-222, 227-233; Dkt. No. 31-10).  The October 26, 2015 hearing notice to Plaintiff stated:

> Attached is a list of witnesses and advisors on behalf of the University, Loe and yourself.  You are responsible for contacting and ensuring your advisor and witnesses appear on time.

(Dkt. No. 31-9 at 2).

On the following day, Plaintiff's counsel contacted the University's general counsel by e-mail to inquire whether the general counsel represented University employees whom Plaintiff planned to call as witnesses (Dkt. No. 31-10 at 4).  If so, the message continued, the Massachusetts Supreme Judicial Court's Rules of Professional Conduct prohibited Plaintiff's counsel's communication with them without the University's general counsel's consent (*id.*).  Plaintiff's counsel's message stated:  "[I]f you do represent these individuals, please assure me that all of the [WNEU] employees who are on [Plaintiff's] witness list will be present and available to testify throughout the course of the hearing . . . ." (*id.*).  The University's general counsel responded by e-mail the next day (Dkt. No. 31-10 at 3).  She notified Plaintiff's counsel that she represented "the administrators involved in this proceeding" (*id.*).  She further advised that the University's policy did not permit any advisor to a student charged with misconduct to

interview any witnesses, whether University employees or students, prior to the hearing (*id.*). She added that "any witnesses who have been identified will be available should the Hearing Officers deem it necessary to question them" (Dkt. No. 31-10 at 4).[24]  Plaintiff argues that this sentence constituted a guarantee that the University would secure the appearance of his witnesses (Dkt. No. 22 ¶¶220-222).

The communications from the University, including the 2015-2016 Handbook, clearly notified Plaintiff of his responsibility to secure the attendance of his witnesses (Dkt. No. 1-2 at 43; Dkt. No. 31-8 at 3; Dkt. No. 31-9 at 2).  The University's general counsel's e-mail message did not promise that Plaintiff's witnesses would be present, and, in any event, did not alter Plaintiff's obligation.  *Cf. Coffin v. Bowater Inc.*, 501 F.3d 80, 98 (1st Cir. 2007) ("'Extrinsic evidence should not be used to add terms to a contract that is plausibly complete without them'") (quoting *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 608 (7th Cir. 1993) (en banc)).  Plaintiff does not allege or show that the University had subpoena power or the authority to compel witnesses' appearances at a disciplinary hearing.  Because Plaintiff is not an attorney, the Rules of Professional Conduct did not prevent him from communicating with any University administrator he wanted to call as a witness.

In an effort to show the harm caused by this purported "profound procedural failure," the Complaint summarizes the testimony that five proposed witnesses would have offered if they

---

[24] Plaintiff's counsel's follow-up e-mail on October 29, 2015 asked whether the general counsel represented four specific employees, or whether he was permitted to contact them (Dkt. No. 31-10 at 3).  The general counsel responded that because she represented all University employees, the University's policy and the Rules of Professional Conduct did not permit counsel to contact any employees (*id.* at 2).

had attended the hearing (Dkt. No. 22 ¶¶229-233).[25]  Plaintiff's conclusory claim -- that if these witnesses were present at the hearing, their testimony would have altered the outcome of the proceeding -- piles speculation on speculation (*id*.).  Because the CRB had discretion to hear relevant testimony and to ask questions, there is no assurance that these individuals, who did not witness the encounter between Plaintiff and Loe, would have been permitted to testify (Dkt. No. 1-2 at 44; Dkt. No. 22 ¶¶229-233).  If they testified, the CRB controlled the questioning and Plaintiff does not provide any basis to conclude that the CRB would have elicited the testimony that Plaintiff presents in his Complaint (Dkt. No. 1-2 at 44).  Plaintiff does not adequately allege a breach of contract on this ground.  *See Cloud*, 720 F.2d at 726 ("failure of the university to produce the witnesses requested by [plaintiff], whose relevance and importance are far from obvious, did not violate the fairness 'standard' . . . ").[26]

   6.   Plaintiff fails to adequately allege a procedurally flawed process.

   Plaintiff argues that the CRB failed to correctly apply the "presumption of innocence, the burdens of proof and production, or the standards of proof" (Dkt. No. 36 at 12).  "His contention that the board failed to use the appropriate standard[s] is a legal conclusion, not a factual allegation." *Schaer*, 735 N.E.2d at 378-79.  As such, the court is entitled to disregard it.  *See Ocasio-Hernandez v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011).  A student at a private university is not afforded the same procedural protections that apply to a criminal defendant.  *See*

---

[25] Plaintiff does not claim that any of these five individuals were University employees (Dkt. No. 22 ¶229-233).

[26] As an aspect of Plaintiff's breach of contract claim, he argues that the University treated him unfairly and was biased against him because he was a male student who was accused of sexual misconduct.  These contentions are relevant respectively to his claim in Count V of a breach of the common law duty of basic fairness, and his claim in Count XI of a violation of Title IX, rather than to an alleged breach of contract.

*Schaer*, 735 N.E.2d at 381.  The Title IX Policy required the CRB to apply the "more likely than

not" standard to the totality of the evidence that they considered (Dkt. No. 1-6 at 10; Dkt. No.

31-13 at 2-3).  Because the CRB complied, the University did not breach its obligations under

the terms of the contract.

In addition, Plaintiff fails to point to facts that would support his allegation that he was

assigned the burdens of proof and production, which rendered the hearing unfair.  *See Cloud*, 720

F.2d at 725; *Schaer*, 735 N.E.2d at 380.  WNEU's general counsel's alleged statement at the pre-

hearing informational meeting in October 2015 that Plaintiff "was in the predicament he was in

because [he] had 'failed to come forward' to provide his own statement about what had

happened," merely stated the obvious:  after Loe's initial complaint to Ollson, Plaintiff refused to

relate his version of events to Kenneally and Hill, and the investigation ensued, which led to

allegations of violations of the Student Code of Conduct (Dkt. No. 22 ¶¶46, 95, 122, 136, 191;

Dkt. No. 31-8 at 2; Dkt. No. 33 at 22).  In addition, general counsel was not a member of the

CRB who determined Plaintiff's responsibility for sexual misconduct (Dkt. No. 31-13 at 3).[27]

Notwithstanding discrepancies in Doe's statements about her encounter with Plaintiff,

there was an evidentiary basis for the CRB's decision.  Plaintiff's disagreement with that decision

does not constitute a claim upon which relief can be granted due to the absence of "basic

fairness."  *Schaer*, 735 N.E.2d at 380 (quoting *Cloud*, 720 F.2d at 725).

In summary, to the extent that Count I alleges a breach of contract based on the

University's retroactive application of its Title IX Policy and its failure to notify Plaintiff of the

---

[27] Plaintiff argues that there is a dispute about "the timing of general counsel's statement" (Dkt. No. 36 at 12).  However, he does not provide a citation to the record to support his argument that Defendants claim that the statement was made in July, as opposed to October (*id.*).  In any event, the alleged statement does not support his claim, irrespective of the timing.

charges against him, the court recommends that Defendants' motion to dismiss Count I be denied.  As to the other allegations, the court recommends that the breach of contract count be dismissed.

      B.    <u>Breach of the Implied Covenant of Good Faith and Fair Dealing (Count II)</u>

Count II alleges that the University breached the implied covenant of good faith and fair dealing by failing to follow the Handbook's policies and procedures and by conducting an "unfair and biased" investigation and "adjudication"  (Dkt. No. 22 ¶¶288-291).  "The covenant of good faith and fair dealing is implied in every contract."  *Uno Rests., Inc. v. Bos. Kenmore Realty Corp.,* 805 N.E.2d 957, 964 (Mass. 2004).  "The duty of good faith and fair dealing concerns the manner of performance."  *Id.*  "The covenant may not, however, be invoked to create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance."  *Id.*  Accordingly, "[t]he requirement of good faith performance is . . . circumscribed by the obligations in the contract."  *Speakman v. Allmerica Fin. Life Ins.,* 367 F. Supp. 2d 122, 132 (D. Mass. 2005).  "A breach occurs when one party violates the reasonable expectations of the other."  *Eigerman v. Putnam Invs., Inc.*, 877 N.E.2d 1258, 1264 (Mass. 2007) (citing *Uno Rests.*, 805 N.E.2d at 966).

The allegations of the Complaint are sufficient to state a breach of the implied covenant regarding WNEU's retroactive application of its Title IX Policy.  Plaintiff reasonably expected that he would be required to conform his behavior to the standards of conduct in the 2014-2015 Handbook and would face sanctions if he violated these standards (Dkt. No. 22 ¶¶68-85).  After he received notice of the provisions of the Student Code of Conduct that he was alleged to have violated, he reasonably expected that the University's CRB would measure his behavior against

those standards (Dkt. No. 22 ¶191).  The University breached Plaintiff's reasonable expectations when the CRB applied the Title IX Policy's definitions of sexual misconduct, which had not been released to the student community at the time of the alleged sexual assault.  *Compare Brown Univ.*, 2016 WL 715794 at *15 ("Because [plaintiff's] [c]omplaint states a plausible claim for breach of contract, . . . the [c]ourt finds that he similarly states a claim that this conduct violated the covenant of good faith and fair dealing inherent in that contract").

Plaintiff, however, has failed to allege sufficient facts to demonstrate that the University failed to "conform[] to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain . . ." in any other respect.  *Brandeis*, 2016 WL 1274533 at *41.  Plaintiff has not alleged facts from which an inference could be drawn that the University violated its other obligations in the Handbooks or the Title IX Policy or that it conducted the disciplinary procedures arbitrarily or capriciously or in bad faith.  *See Coveney*, 445 N.E.2d at 139.

Accordingly, the court recommends that Defendants' motion to dismiss Count II be denied to the extent that it alleges a breach of the covenant of good faith and fair dealing based on the University's retroactive application of its Title IX Policy and its failure to notify Plaintiff of the charges against him.  As to the other allegations, the court recommends that Count II be dismissed.

     C.    <u>Estoppel and Reliance (Count III)</u>

Plaintiff's claim for promissory estoppel alleges that he relied to his detriment on the University's "express and implied promises and representations" that were contained in the 2014-2015 Handbook "and elsewhere" (Dkt. No. 22 ¶¶292-297).  "Generally, the doctrine of promissory estoppel is applicable when a promise has been made, but there is no tangible

consideration offered in return; instead, detrimental reliance acts as a substitute for actual consideration." *In re J.P. Morgan Chase Mortg. Modification Litig.*, 880 F. Supp. 2d 220, 238 (D. Mass. 2012) (citing Restatement (Second) of Contracts § 2 (Am. Law Inst. 1981)). "It is well-established that recovery under a quasi-contract theory is not available where there is a written contract governing the same subject matter." *Brandeis*, 2016 WL 1274533, at *41. Here, "there is no dispute that the student-university relationship is governed by contract, which includes the reasonable expectations of students based on the [Handbooks and the Title IX Policy]." *Brown Univ.*, 2016 WL 715794, at *15.

Plaintiff argues that he detrimentally relied upon the University's general counsel's representation that "all his witnesses would attend his hearing" (Dkt. No. 36 at 16).

> To plead a promissory estoppel claim under Massachusetts law, [Plaintiff] must allege that: (1) [the University] made an unambiguous promise which it should have reasonably expected to "induce action or forbearance of a definite and substantial character" on the part of [Plaintiff]; (2) the promise induced action or forbearance; and (3) "injustice can be avoided only by enforcement of the promise."

*Aston Martin Lagonda of N. Am., Inc. v. Lotus Motorsports, Inc.*, Civil Action No. 13-cv-11213, 2014 WL 1092864, at *6 (D. Mass. Mar. 18, 2014) (quoting *Neuhoff v. Marvin Lumber & Cedar Co.,* 370 F.3d 197, 203 (1st Cir. 2004)). Plaintiff's Complaint is wholly deficient in these respects. General counsel's statement was not an "unambiguous promise" to secure the attendance of Plaintiff's witnesses. *Id.* Even if this were a reasonable interpretation of the comment, Plaintiff has not alleged "action or forbearance" due to his reliance. *Id.* In other words, he does not state that, but for general counsel's statement, he would have secured the presence of his witnesses. Further, due to the CRB's discretion regarding witnesses and their testimony, Plaintiff cannot plead sufficient facts to demonstrate that the failure to enforce general counsel's promise resulted in injustice. *See id.*

The court recommends dismissal of the promissory estoppel claim (Count III).

D.      Breach of the Common Law Duty of Basic Fairness (Count V)

Plaintiff alleges that the University breached its common law duty to afford him a fair

process (Dkt. No. 22 ¶¶286, 302-305). [28]   However, Plaintiff's failure to plausibly claim that the

University's decision was arbitrary or capricious or made in bad faith bars relief under the "basic

fairness" standard.  *Cloud*, 720 F.2d at 725.  *See Coveney,* 445 N.E.2d at 138-39.

The University's "obligation to provide basic fairness in its proceedings is separate from

and in addition to its contractual obligation to follow the rules it set forth in the Handbook."

*Brandeis*, 2016 WL 1274533, at *31.  *See Cloud*, 720 F.2d at 725; *Schaer*, 735 N.E.2d at 380.

Notwithstanding this court's obligation to consider fairness, "'[c]ourts are chary about interfering

with academic and disciplinary decisions made by private colleges and universities.'"  *Schaer*,

735 N.E.2d at 381 (quoting *Schaer v. Brandeis Univ.,* 716 N.E.2d 1055, 1060 (Mass. App. Ct.

1999)).  "'If school officials act in good faith and on reasonable grounds . . . their decision to

suspend or expel a student will not be subject to successful challenge in the courts.'"  *Cloud,* 720

F.2d at 724 (quoting *Coveney,* 445 N.E.2d at 139).  "A university is not required to adhere to the

standards of due process guaranteed to criminal defendants or to abide by rules of evidence

adopted by courts."  *Schaer*, 735 N.E.2d at 381.

In *Brandeis,* 2016 WL 1274533, another session of this court concluded that Brandeis

had violated its duty to conduct a disciplinary process with basic fairness.  Brandeis's process

was, however, very different from the disciplinary process at WNEU.  At Brandeis, a Special

---

[28] Plaintiff's allegation that the University "guarantee[d]" a fair process was not based on any
Handbook language (Dkt. No. 22 ¶286).  Instead, he quoted text – out of context – from the
University's June 25, 2015 letter to him (Dkt. No. 22 ¶¶65, 66; Dkt. No. 31-2 at 2-3; Dkt. No. 36
at 9).

Examiner controlled the entire disciplinary process beginning with the investigation and

concluding with the determination of responsibility, which was "final." *Id*. at *3, *10-14.  The

*Brandeis* court described this as "a secret and inquisitorial process." *Id.* at *3.  Brandeis's motion

to dismiss was denied, in part, because the plaintiff "was provided little . . . in terms of

procedural protection." *Id.* at *10.  The *Brandeis* plaintiff was not entitled to a "'hearing' in any

sense of the word," which is essential to the fundamental fairness of an academic institution's

disciplinary process.  *Id*. at *3, *10.  *Compare Cloud*, 720 F.2d at 723 (plaintiff was afforded a

hearing before an impartial panel); *Walker*, 82 F. Supp. 3d at 532 (same); *Coveney*, 445 N.E.2d

at 139 (holding that the college's expulsion of the student was not arbitrary and capricious where

the student was provided two hearings and the opportunity to make statements).

Here, the allegations in the Complaint show that the investigation was conducted by two

Title IX investigators, Kenneally and Hill, who were not members of the CRB, that Plaintiff had

access to investigatory materials and the names of witnesses prior to the hearing, that the two-

member CRB, Burke and Elfant, determined responsibility after a hearing, which Plaintiff and

his counsel attended and in which Plaintiff participated, and that Plaintiff received a copy of the

CRB's written decision, which he used to pursue his appeal (*See, e.g.,* Dkt. No. 22 ¶¶22, 59-61,

91, 94-115, 121, 127, 138-161, 165-173, 195-196, 203-210; 229-234, 255; Dkt. No. 31-2 at 3;

Dkt. No. 31-13).  WNEU's 2015-2016 Handbook set out the rules for the hearing, including

Plaintiff's opportunity to submit a written statement, "to hear all witness statements, to present

relevant evidence, and to direct questions to the hearing board . . ." (Dkt. No. 1-2 at 44).  The

CRB's decision was subject to review by Hart-Steffes, who had the authority to overturn the

CRB's decision (Dkt. No. 1-2 at 45).  These procedures, which were followed in Plaintiff's case,

make *Brandeis* clearly distinguishable.

Plaintiff calls attention to the pre-hearing statements of Hendricks and Ollson in an effort to demonstrate WNEU's bias against him.  He points to Ollson's comment that Plaintiff "should be the one to request [no contact] measures" (Dkt. No. 22 ¶184; Dkt. No. 31-7 at 2).[29]  Plaintiff, however, does not contend that Ollson, or anyone at the University, denied his request for an accommodation regarding his contact with Loe and he fails to acknowledge that all Ollson said was that the University should wait for Plaintiff to ask for no contact measures.  He also complains about Hendricks's statement at the pre-hearing informational meeting that "'[i]t's the University versus the student'" (Dkt. No. 22 ¶¶198, 199).  There is no indication that Hendricks was present at the hearing (Dkt. No. 31-9 at 2).  Neither Ollson nor Hendricks was a member of the CRB (Dkt. No. 31-13 at 2-3).  *See Bleiler*, 2013 WL 4714340, at *12 (holding that faculty member's views were not relevant to the claim of bias under Title IX because he was not a deliberating member of the hearing panel).

Plaintiff plows the same ground regarding the University's failure to provide him with copies of the investigative materials and claims that he first learned of Loe's "exculpatory text messages" at the hearing (Dkt. No. 22 ¶¶15, 245-246; Dkt. No. 36 at 10).  The University permitted Plaintiff and his counsel to review the investigators' records over the course of several hours and his counsel took copious notes (Dkt. No. 22 ¶¶59-61, 94-115, 121, 127, 129-131, 138-161, 165-173, 178, 210-211, 214-215).  Loe's text messages were on the thumb drive that Plaintiff and his counsel were afforded the opportunity to review prior to the hearing (Dkt. No. 22 ¶¶57, 94, 210, 213).  The University was not required to provide copies.[30]  *Contrast*

_____

[29] The complete sentence reads:  "I believe that [Plaintiff] should be the one to request measures as the complainant has" (Dkt. No. 31-7 at 2).

[30] Plaintiff relies upon the following passage from *Brown Univ.*, 2016 WL 715794, to support his contention that the University should have provided him with copies of investigatory materials (Dkt. No. 52 at 2):

*Brandeis,* 2016 WL 1274533, at *3, *13, *30 (plaintiff did not have access to evidence or to the Special Examiner's detailed report).

Plaintiff also alleges that the hearing officers demonstrated their "blatant hostility" toward him by failing to challenge Loe's "lies [and] inconsistent statements" (Dkt. No. 36 at 10-11). In effect, he claims that the CRB's decision to credit Loe's testimony can sufficiently demonstrate bias and an unfair process. But "[i]t is not the business of lawyers and judges to tell universities what statements they may consider and what statements they must reject." *Schaer,* 735 N.E.2d at 380. *See also Doe v. Univ. of the S.,* 687 F. Supp. 2d 744, 755 (E.D. Tenn. 2009) (quoting *Gomes v. Univ. of Me. Sys.*, 365 F. Supp. 2d 6, 14 (D. Me. 2005); *Coveney,* 445 N.E.2d 138-39.

Plaintiff's related contention that the proceedings were unfair due to the University's denial of his ability to cross-examine Loe and other witnesses at the hearing similarly fails (Dkt. No. 36 at 17; Dkt. No. 52 at 4). *See Schaer,* 735 N.E.2d at 381. "[A]ny claim of unfairness due to a requirement that questions be asked through the panel [c]hair fails as a matter of law." *Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 465 (S.D.N.Y. 2015). "Courts have found that similar procedures are procedurally adequate." *Id.* (citing *Donohue v. Baker*, 976 F. Supp. 136, 147 (N.D.N.Y 1997)). Plaintiff was present at the hearing with his counsel and was permitted to

---

One particular challenge in these types of cases is that the best information for discerning whether alleged discrimination was based on the plaintiff's gender as opposed to his status as an accused student is generally in the possession of the defendant: namely, what are the overall outcomes of such cases and, more specifically, how have cases been handled in which the accused student is female and/or the alleged victim is male?

*Id.* at *7. However, the discussion in *Brown* arose in the context of whether Plaintiff's complaint contained a viable claim under Title IX, which would entitle him to discovery, not whether the failure to provide copies of investigatory materials prior to a disciplinary hearing constituted basic unfairness. *See id.*.

direct questions to the CRB members who had discretion to hear evidence that they deemed to be

"reliable and relevant" (Dkt. No. 1-2 at 44; Dkt. No. 22 ¶¶22, 249-253). *Contrast Brandeis*,

2016 WL 1274533, at *16, *34-35 (the disciplinary process did not include a hearing during

which the respondent proposed questions and heard the complainant and witnesses).

     Plaintiff further asserts that Burke, who was one of the two hearing officers, had a

conflict of interest because the investigation and the hearing were controlled by his supervisors,

Ollson and Hill who, according to Plaintiff, were predisposed to find him responsible (Dkt. No.

22 ¶¶24, 237-244).  Because there was no Handbook provision that addressed potential conflicts

of interest, the court considers whether the contention represents a valid claim that the

proceeding failed to comport with standards of basic fairness. *See Cloud*, 720 F.2d at 725;

*Schaer*, 735 N.E.2d at 380. *Compare Bleiler*, 2013 WL 4714340, at *15 ("the [h]andbook sets

forth the policy and rules regarding board members and potential conflicts of interest").

     "In the intimate setting of a college or university, prior contact between the participants is

likely and does not per se indicate bias or partiality." *Gorman v. Univ. of R. I.,* 837 F.2d 7, 15

(1st Cir. 1988).  "Generally the alleged bias of the disciplinary board must be evident from the

record and not based on inference and speculation." *Doe v. Univ. of Cincinnati*, Case No. 1:15-

CV-681, 2016 WL 1161935, at *9 (S.D. Ohio Mar. 23, 2016).  Even accepting as true Plaintiff's

allegations that Ollson's and Hill's pre-hearing statements demonstrated their bias against

Plaintiff, that Ollson supervised the investigation and Hill's report, and that Hill presented the

University's case against Plaintiff at the hearing, Plaintiff's claim that Ollson and Hill influenced

Burke, their subordinate, is speculative.  This bald assertion is not legally sufficient to sustain a

claim for relief. *See Ikpeazu v. Univ. of Neb.,* 775 F.2d 250, 254 (8th Cir. 1985) (holding that a

school's disciplinary body "is entitled to a presumption of honesty and integrity absent a showing

of actual bias such as animosity, prejudice, or a personal or financial stake in the outcome can be proven"); *Univ. of the S.*, 687 F. Supp. 2d at 751 ("a court is not required to accept conclusory legal allegations cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged") (citing *Twombly*, 550 U.S. at 570); *Bleiler*, 2013 WL 4714340, at *13 ("'alleged prejudice of university hearing bodies must be based upon more than mere speculation and tenuous inferences'") (quoting *Buckholz v. Mass. Inst. of Tech.,* No. 85–2720, 1993 WL 818618, at *3 (Mass. Super. Ct. July 6, 1993)).  Moreover, Burke was not the sole hearing officer.  Elfant, the second hearing officer, also found Plaintiff responsible (Dkt. No. 31-13 at 3).  Plaintiff does not allege any facts which would lead to an inference of conflict on Elfant's part.  In addition, the CRB's decision was reviewed by Hart-Steffes, who found that Elfant and Burke followed the University's "process and procedures exactly as they should" and affirmed their decision, but modified the sanction (Dkt. No. 31-14 at 5).  Again, Plaintiff has not alleged that Hart-Steffes labored under a conflict of interest.

Plaintiff's final allegation -- that the appeal process was unfair because he could not seek review on the ground that the CRB's decision was not supported by the evidence -- is similarly deficient (Dkt. No. 52 at 4).[31]  The 2015-2106 Handbook's terms prohibited a de novo rehearing of the case on appeal (Dkt. No. 1-2 at 45).  Courts do not rewrite such provisions.  *See Doe v. Brown Univ.*, C.A. No. 15-239-M-PAS, 2016 WL 3570606, at *9 (D.R.I. June 27, 2016) (quoting *Gorman v. St. Raphael Acad.*, 853 A.2d 28, 34 (R.I. 2004)).  Plaintiff raised the issue of Loe's credibility in his appeal to Hart-Steffes, who responded that "the investigators noted and [she] confirmed inconsistencies in Loe's information.  A review of the case with the [CRB] also

---

[31] The 2015-2016 Handbook permitted respondents and complainants to request review, but they were "not entitled to a re-hearing of the case" (Dkt. No. 1-2 at 45).

presented inconsistencies in [Plaintiff's] testimony at the hearing" (Dkt. No. 31-14 at 4).  In other

words, the CRB apparently recognized the contradictions in Loe's version, also found

inconsistencies in Plaintiff's accounts, but found Loe more credible (Dkt. Nos. 31-13, 31-14).

That this decision was committed to the CRB's discretion does not, as a matter of law, make the

process unfair.  *See Univ. of the S.*, 687 F. Supp. 2d at 755; *Schaer*, 735 N.E.2d at 380.

WNEU's process did not suffer from the inherent unfairness that the *Brandeis* court

identified:  the Special Examiner's "power to investigate, prosecute, and convict with little

effective power of review." *Brandeis,* 2016 WL 1274533, at *13-14, *36.  Because of this

inherent procedural inequity, the *Brandeis* court found that the respondent's inability to appeal

"on the ground that the Special Examiner's decision was not supported by the evidence, or that it

was unfair, unwise, or simply wrong" deprived him of basic fairness. *Id*. at *36.  The process at

WNEU was not similarly flawed.

Because Plaintiff fails to state a claim of basic procedural unfairness, the court

recommends that Count V be dismissed.

> E.     Intentional Infliction of Emotional Distress (Count VII)

> Count V asserts a claim for IIED against all Defendants (Dkt. No. 22 ¶¶310-315).

> In Massachusetts, to state such a claim, a plaintiff must allege (1) that the defendant
> either intended to inflict emotional distress or knew or should have known that emotional
> distress was the likely result of his conduct; (2) that the conduct was extreme and
> outrageous; (3) that the conduct caused the plaintiff emotional distress; and (4) that the
> emotional distress was severe and of a nature that no reasonable person could be expected
> to endure it.

*Brandeis,* 2016 WL 1274533, at *45 (citing *Agis v. Howard Johnson Co.*, 355 N.E.2d 315, 318-

19 (Mass. 1976)).

"Conduct is 'extreme and outrageous' only if it is 'so outrageous in character, and so

extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as

43

atrocious, and utterly intolerable in a civilized community.'" *Id.* (quoting *Foley v. Polaroid Corp.*, 508 N.E.2d 72, 82 (Mass. 1987) (quoting Restatement (Second) of Torts § 46 cmt. d (Am. Law Inst. 1965)).  WNEU's actions, as pled, do not rise to the requisite level of atrocity.  *See Fellheimer*, 869 F. Supp. at 247 (holding that the college's decision to conduct a process to determine a male student's responsibility for alleged sexual misconduct was not "extreme or outrageous" despite the college's failure to provide the student with adequate notice of his alleged misconduct); *Brandeis*, 2016 WL 1274533, at *45 (holding that despite the unfairness and unreasonableness of the university's actions, the facts in the complaint did not constitute the sort of "targeted, deliberate, and malicious conduct that is required for an IIED claim"); *Harris v. St. Joseph's Univ.*, Civil Action No. 13-3937, 2014 WL 1910242, at *11–12 (E.D. Pa. May 13, 2014) (holding that facts alleged in the amended complaint "fail[ed] to satisfy the requisite outrageous conduct for such a claim" despite allegations that plaintiff was falsely portrayed as a "'cruel sex offender'").  The court recommends that Count VII be dismissed for failure to state a claim.

     F.     <u>Title IX (Count XI)</u>

Plaintiff alleges that the University's disciplinary action was erroneous and was motivated by gender bias in violation of Title IX (Dkt. No. 22 ¶¶352-379).  *See Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994); *Marshall v. Ohio Univ.*, No. 2:15-cv-775, 2015 WL 1179955, at *7 (S.D. Ohio Mar. 13, 2015).  "Title IX of the Education Amendments of 1972 is a federal statute designed to prevent sexual discrimination and harassment in educational institutions receiving federal funding." *Marshall v. Ohio Univ.*, 2015 WL 1179955, at *7.  Title IX provides, in pertinent part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any

educational program or activity receiving Federal financial assistance . . . ."  20 U.S.C. §

1681(a).  "Title IX is enforceable through an implied right of action for monetary damages, as

well as injunctive relief."  *Yusuf*, 35 F.3d at 714 (citation omitted) (citing *Franklin v. Gwinnett*

*Cty. Pub. Sch.,* 503 U.S. 60, 76 (1992)).  *See Brown Univ.*, 2016 WL 715794, at *5.  In order to

show a violation of Title IX, Plaintiff must ultimately demonstrate "'that the defendant

discriminated against him or her *because of sex;* that the discrimination was intentional; and that

the discrimination was a "substantial" or "motivating factor" for the defendant's actions.'"  *Brown*

*Univ.*, 2016 WL 715794, at *5 (quoting *Doe v. Columbia Univ.*, 101 F. Supp. 3d 356, 367

(S.D.N.Y. 2015)), *vacated*, Docket Nos. 15-1536 (Lead), 15-166 (XAP), 2016 WL 4056034 (2d

Cir. July 29, 2016)).

    "In *Yusuf*, the Second Circuit developed a framework for [the analysis of] cases attacking

university disciplinary proceedings on the ground of gender bias, which 'fall generally within

two categories' — 'erroneous outcome' and 'selective enforcement.'"  *Id.* (quoting *Yusuf*, 35 F.3d

at 715).[32]  "Although the First Circuit has not directly confronted the issue, district courts in the

First Circuit have looked to the framework established in *Yusuf*, subject to the heightened

pleading standard set forth in *Twombly* and *Iqbal*."  *Id.* (citing *Doe v. Univ. of Mass.–Amherst*,

Civil Action No. 14-30143-MGM, 2015 WL 4306521, at *8 (D. Mass. July 14, 2015), *appeal*

*docketed*, No. 15-856 (1st Cir. July 28, 2015)).[33]  *See also Bleiler*, 2013 WL 4714340, at *5.

---

[32] Courts have also applied the "deliberate indifference" and "archaic assumptions" standards to
Title IX claims.  *See Bleiler*, 2013 WL 4714340, at *5 & n.4.

[33] *Yusuf* was decided prior to the Court's decisions in *Iqbal* and *Twombly*, when the standard for a
motion to dismiss was "more relaxed."  *Univ. of Mass.-Amherst*, 2015 WL 4306521, at *8 n.5.

"In . . . 'erroneous outcome' cases, 'the claim is that the plaintiff was innocent and wrongly found to have committed an offense.'" *Brown Univ.*, 2016 WL 715794, at *5 (quoting *Yusuf*, 35 F.3d at 715). [34]

> To state a claim for erroneous outcome discrimination, a plaintiff must allege (1) "a procedurally or otherwise flawed proceeding"; (2) "that has led to an adverse and erroneous outcome"; and (3) "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." To satisfy the third element, a plaintiff must do more than merely rely on "a conclusory allegation of gender discrimination. . . ." Sufficiently particularized allegations of gender discrimination "might include, *inter alia,* statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender."

*Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 766 (D. Md. 2015) (quoting *Yusuf*, 35 F.3d at 715). *See also Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015); *Brown Univ.,* 2016 WL 715794, at *5; *Bleiler,* 2013 WL 4714340, at *5 ("Under the 'erroneous outcome' standard, the question is whether the [c]ollege's actions are 'motivated by sexual bias' or if the 'disciplinary hearing process constitutes a "pattern of decision-making" whereby the [college's] disciplinary procedures governing sexual assault claims is "discriminatorily applied or motivated by a chauvinistic view of the sexes"'") (quoting *Univ. of the S.*, 687 F.Supp.2d at 756).

Plaintiff alleges that:  (1) the disciplinary proceedings were flawed in several respects; (2) these flaws produced an erroneous outcome; and (3) gender bias was the motivating factor for this erroneous outcome (Dkt. No. 22 ¶¶352-379).  Although most of Plaintiff's complaints about the process fail to state a claim, he has adequately alleged that the proceeding was flawed -- and the outcome possibly erroneous -- due to the CRB's retroactive application of the Title IX Policy's definition of sexual misconduct.  *See Salisbury Univ.*, 123 F. Supp. 3d at 766 (quoting

---

[34] Because the "selective enforcement," "deliberate indifference," and "archaic assumptions" standards have no application to the instant case, they are not addressed by the court.

*Yusuf*, 35 F.3d at 715).  However, the Complaint is rife with conclusory allegations of WNEU's

"prejudice and bias against [Plaintiff] not because he was the accused . . . but because he is a

male" (Dkt. No. 22 ¶¶175, 178, 185, 254, 278, 370, 374, 378).  These bare averments of motive

are not sufficient to survive a motion to dismiss even when the standard of review, which favors

Plaintiff, is stretched to its limits.  *See Cooperman v. Individual, Inc.,* 171 F.3d 43, 46 (1st Cir.

1999).  Accordingly, Plaintiff falls short of meeting the third requirement for a viable Title IX

violation.  *See Harris*, 2014 WL 1910242, at *4 ("The averments in the . . . [c]omplaint which

purport to identify '[e]vidence of [the University's] impermissible gender bias against [Plaintiff]',

. . . do not suggest gender bias as a motivating factor").

"[A]llegations of a procedurally or otherwise flawed proceeding that has led to an adverse

and erroneous outcome combined with a conclusory allegation of gender discrimination is not

sufficient to survive a motion to dismiss."  *Yusuf,* 35 F.3d at 715.  Plaintiff asserts that Ollson,

the Title IX officer who oversaw the investigation, and Hill, one of the Title IX investigators,

were biased against males and that they influenced their subordinate, Burke, one of the two

hearing officers who found Plaintiff responsible for sexual misconduct (Dkt. No. 22 ¶¶178-180,

239-243; Dkt. No. 36 at 18-19).  But Plaintiff fails to allege particularized facts that would

permit a factfinder to draw the reasonable inference that gender discrimination was a motivating

factor behind the CRB's decision.  *See Prouty v. Hartford Life & Acc. Ins. Co.*, 997 F. Supp. 2d

85, 88 (D. Mass. 2014) ("even accepting a complaint's factual allegations, together they must

establish, directly or by reasonable inference, each element required to support recovery under

some actionable legal theory") (citing *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*,

406 F.3d 1, 6 (1st Cir. 2005)); *Brown Univ.*, 2016 WL 715794, at *5.

Plaintiff relies on his allegations about Ollson's and Hill's words and demeanor to demonstrate gender bias. *See Yusuf*, 35 F.3d at 715. Plaintiff reprises his argument that Ollson "*refused* to offer [Plaintiff] the same accommodations as offered to . . . Loe" (Dkt. No. 22 ¶¶24, 184, 377; Dkt. No 36 at 18; Dkt. No. 31-7 at 2) (emphasis original). Plaintiff, however, does not allege disparate treatment; that is, that he requested protection from contact with Loe, and that Ollson, or anyone, denied it.

Plaintiff's attempt to demonstrate Hill's gender bias also falls far short of being sufficient. He avers that Hill's "bullying" of him during his initial interview demonstrated her bias against males (Dkt. No. 22 ¶¶132-135; Dkt. No. 36 at 10). Plaintiff's initial interview was delayed due to "the time it was taking for [Plaintiff's counsel] to copy [Loe's] lengthy [initial] interview summary by hand" (Dkt. No. 22 ¶132). Hill "yelled" at Plaintiff and "insist[ed] that [he] had to immediately start answering her questions" (*id.*). Viewing Hill's behavior in the light most favorable to Plaintiff does not raise a reasonable inference of gender bias. *See Nisselson v. Lernout*, 469 F.3d 143, 150 (1st Cir. 2006). *Compare Sahm*, 110 F. Supp. at 778-79 (holding that bias against students accused of sexual assault is not equivalent to bias against males) (citing *Bleiler*, 2013 WL 7414340, at *12); *Univ. of Mass.-Amherst*, 2015 WL 4306521, at *8 ("Plaintiff has not cited examples of any comments that targeted him based on his gender — as opposed to his status as a student accused of sexual assault — or any conduct suggestive of gender bias"). *Contrast Doe v. Columbia Univ.*, Docket Nos. 15-1536 (Lead), 15-1661 (XAP), 2016 WL 4056034, at *5, *9 (2d Cir. July 29, 2016) (vacating the dismissal of the Title IX complaint because the investigator was "motivated by a pro-female sex bias"). The absence of facts to support Ollson's and Hill's alleged gender bias belies Plaintiff's conclusory assertion that their gender bias influenced Burke's decision. Nor does Plaintiff's reference to general counsel's

comment about his "predicament" strengthen his case (Dkt. No. 22 ¶94). Plaintiff has not alleged that WNEU's general counsel played a role in the CRB's decision. *See Mallory v. Ohio Univ.,* 76 Fed. Appx. 634, 640 (6th Cir. 2003) (allowing defendant's motion for summary judgment and finding that "[w]ithout any evidence that [an allegedly biased University employee] influenced the voting members to find against [plaintiff] because of his sex, and without any indication that [the allegedly biased employee] affected the proceedings in a significant way, [plaintiff] has not demonstrated that a genuine issue of material fact exists with respect to his assertion of a sex-based erroneous outcome").

Plaintiff "asserts no facts to suggest that [the University's administrators] would have treated a female accused of sexual assault any differently . . . or that the University would have acted differently in a disciplinary procedure against a female accused of sexual assault." *Sahm*, 110 F. Supp. 3d at 779. Burke's alleged bias is not supported by "any of the[] traditional means of demonstrating gender bias." *Id.* at 778. Instead, Plaintiff relies on legal conclusions, which the court is counseled to ignore (Dkt. No. 22 ¶244). *See Iqbal*, 556 U.S. at 678. Absent from the Complaint are statements by Burke, or Elfant, the other member of the CRB, or any other pertinent University employee that indicate gender discrimination (Dkt. No. 31-13 at 2-3). *See Yusuf*, 35 F. 3d at 715; *Sahm*, 110 F. Supp. 3d at 778. In addition, Plaintiff has neither alleged nor established a pattern of biased decision making by WNEU. *See Yusuf,* 35 F.3d at 715. "[O]ne case by an individual who was subjectively dissatisfied with the result [of a disciplinary proceeding] does not constitute 'a pattern of decision-making' . . . ." *Mallory,* 76 Fed. Appx. at 640 (quoting *Yusuf*, 35 F.3d at 315). Without any facts to support Plaintiff's assertions that Ollson and Hill were biased against males and that they influenced Burke, or that discrimination against males motivated the CRB's decision, Plaintiff fails to state a viable claim for relief.

In cases in which courts have denied motions to dismiss Title IX claims, plaintiffs alleged facts in the form of specific statements or patterns of conduct which plausibly suggested that gender bias motivated erroneous findings that male plaintiffs were responsible for sexual misconduct.  *See Yusuf*, 35 F.3d at 715.  For example, in *Prasad v. Cornell Univ.,* Civil Action No. 5:15-cv-322, 2016 WL 3212079 (N.D.N.Y. Feb. 24, 2016), the plaintiff alleged that "an Investigative Report . . . misconstrued and slanted the evidence against [him]," that there was "a drastic turnaround" in one investigator's position, and that "a gender stereotype adverse to males charged with sexual assaults existed at Cornell causing such disciplinary proceedings to 'invariably' end adversely to male respondents."  *Id.* at *16-17.

Similarly, in *Brown Univ.*, 2016 WL 715794, plaintiff's complaint included "specific allegations related to [the university's] gender bias as opposed to bias against students accused of sexual assault," including particular statements of a former employee and two professors, and identification of prior cases of sexual misconduct at the university, which allegedly demonstrated a pattern of gender bias in favor of females.[35]  *Id.* at *8-9.  *See also Columbia Univ.*, 2016 WL 4056034, at *7-10 (vacating dismissal and remanding for consideration under the clarified standard of review to determine whether the complaint alleged sufficient facts to support a plausible inference that "the [u]niversity's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual assault"); *Yusuf*, 35 F.3d at 716 (denying motion to dismiss due to complaint's plausible assertion that "males

---

[35] Although these allegations were pled "upon information and belief," the court found that "[t]his manner of pleading 'is a permissible way to indicate a factual connection that plaintiff reasonably believes is true but for which the plaintiff may need discovery to gather and confirm its evidentiary basis.'"  *Brown Univ.*, 2016 WL 715794, at *9 (quoting *Salisbury Univ.*, 123 F. Supp. 3d at 768).

invariably lose when charged with sexual harassment at Vassar"); *Salisbury Univ.*, 123 F. Supp. 3d at 766-68 (denying defendants' motion to dismiss due to allegations, which were based on information and belief, that the university possessed communications that evidenced their bias against males accused of sexual assault, and that the university sought to demonstrate to the Department of Education and to the general public that they were "'aggressively disciplining male students accused of sexual assault'"); *Wells v. Xavier Univ.*, 7 F. Supp. 3d 746, 747, 751 (S.D. Ohio 2014) (denying motion to dismiss based on procedural flaws in the disciplinary process and plaintiff's allegation that the university made him a "scapegoat" due to two OCR investigations into the university's handling of allegations of sexual misconduct complaints; plaintiff adequately pleaded that the university "had a pattern of decision-making" that reflected gender bias against males); *Washington & Lee Univ.*, 2015 WL 4647996, at *10 (denying motion to dismiss based on alleged flaws in the proceedings and specific biased statements of a university official, who wielded "considerable influence" over the outcome of the disciplinary process).

This case falls on the side of those in which Title IX claims were dismissed for failure to plead sufficient particularized factual allegations to support a "causal connection" between gender bias and the erroneous finding of responsibility for sexual misconduct. *Yusuf*, 35 F.3d at 715. *See Sahm*, 110 F. Supp. 3d at 778-80 (dismissing plaintiff's Title IX claim because the complaint failed to allege any statements of members of the disciplinary body or university officials or any patterns of conduct that permitted the court to infer bias against male students); *Univ. of Mass.-Amherst*, 2015 WL 4306521, at *8 (dismissing plaintiff's Title IX claim because he failed to cite any statements that plausibly suggested the university's gender bias and because his unsupported claim that the university discriminated against males accused of sexual

misconduct was insufficient); *Harris,* 2014 WL 1910242, at *4 (E.D. Pa. May 13, 2014)

(dismissing plaintiff's Title IX claim due to his failure to allege sufficient facts to support his

claim that gender bias was a motivating factor in the university's decision); *see also King v.*

*DePauw Univ.*, Cause No. 2:14-cv-70-WTL-DKL, 2014 WL 4197507, at *10 (S.D. Ind. Aug.

22, 2014) (denying plaintiff's motion for a preliminary injunction based on an alleged violation

of Title IX due to the absence of any evidence that "plaintiff's gender was a motivating factor in

any of [the university's] actions").

Although the Complaint adequately alleges an erroneous outcome due to the retroactive

application of the Title IX Policy, Plaintiff fails to allege sufficient facts to demonstrate that the

University's disciplinary decision was motivated by gender bias.  *See Yusuf*, 35 F.3d at 715.  The

court acknowledges that questions of motive and intent generally are matters reserved for trial.

*See e.g., Scooter Store, Inc. v. SpinLife.com, L.L.C.,* 777 F. Supp. 2d 1102, 1118 (S.D. Ohio

2011) (holding that when "[m]otive and intent are at issue, . . . courts hesitate to grant motions to

dismiss before the parties have an opportunity for discovery").  Nonetheless, Plaintiff had an

obligation to plead sufficient facts from which an inference of gender bias could be drawn, and

he has failed to do so.

Accordingly, the court recommends that Count XI be dismissed.

G.     Declaratory Judgment (Count XIII)[36]

Plaintiff seeks to reverse the sanction and nullify the University's disciplinary process

under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 (Dkt. No. 22 ¶¶380-384).

Defendants argue that this count should be dismissed because of the alleged deficiencies in all of

---

[36] As noted earlier, Plaintiff's Complaint omits Count XII (Dkt. No. 22 at 64-68).

Plaintiff's substantive claims (Dkt. No. 33 at 38).  "[T]he Declaratory Judgment Act does not create its own substantive cause of action." *Brown Univ.*, WL 715794, at *16.  Because the court recommends the denial of the motion to dismiss the claims for breach of contract and breach of the covenant of good faith and fair dealing based on the University's retroactive application of the Title IX Policy and failure to adequately notify Plaintiff of the allegations against him, Plaintiff "continues to state a claim for declaratory relief." *Id.*  Accordingly, the court recommends that Defendants' motion to dismiss Plaintiff's request for declaratory relief (Count XIII) be denied.

V.    CONCLUSION

For the foregoing reasons, the undersigned recommends that Defendants' Motion to Dismiss (Dkt. No. 30) be allowed as to Counts III (estoppel and reliance), IV (unjust enrichment), V (breach of the common law duty of basic fairness), VI (negligence), VII (IIED), VIII (tortious interference with advantageous business relations), IX (violations of the Clery Act and regulations), X (violation of FERPA), and XI (violation of Title IX), be denied as to so much of Count I and Count II as allege a breach of contract and a breach of the covenant of good faith and fair dealing based on the University's retroactive application of the Title IX Policy and failure to adequately notify Plaintiff of the allegations against him, and be denied as to Count XIII (declaratory judgment).[37]

---

[37] The parties are advised that under the provisions of Fed. R. Civ. P. 72(b) or Fed. R. Crim. P. 59(b), any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within fourteen (14) days** of the party's receipt of this Report and Recommendation.  The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection.  The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation.  *See Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271, 275 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d

Dated:  August 31, 2016                    /s/ Katherine A. Robertson
                                           KATHERINE A. ROBERTSON
                                           UNITED STATES MAGISTRATE JUDGE

---

13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-79 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir. 1980).  *See also Thomas v. Arn*, 474 U.S. 140, 154-55 (1985).  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.